## DOWSETT v. DOWSETT.

No. 7263.   Decided June 30, 1949.   (207 P. 2d 809.)

See 60 C. J. S., Motor Vehicles, sec. 436.

*Sidney G. Reid* and *James A. Stump*, Salt Lake City, for appellant.

*Stewart, Cannon & Hanson* and *Ernest F. Baldwin, Jr.*, Salt Lake City, for respondent.

WADE, Justice.

During the middle of June, 1945, when Darwin Dowsett, the respondent herein, was stationed at Camp Maxey, Texas, he telephoned his wife in Holladay, Utah, and informed her that he had secured living quarters at a little town close to camp and wanted her to come and stay with him and to bring his car. He knew his wife could not drive a car, but that both his father and mother could, and suggested that she ask his father and mother to drive the car and bring her along. Nellie Dowsett, the appellant herein, is the mother

of Darwin Dowsett. Mrs. Darwin Dowsett, in compliance with her husband's instructions, requested her mother-in-law and her father-in-law to take her and to drive their son's car to Camp Maxey. This they consented to do. Early in the morning of June 30, 1945, in pursuance of the plans theretofore made, the Dowsetts and a friend left Holladay, Utah, in respondent's car to make the trip to Camp Maxey. Mr. Harold Dowsett was driving and his wife Nellie was sitting at his side in the front seat. Respondent's wife and friend were in the back seat. It was intended that Nellie Dowsett should relieve her husband when he tired of driving but had not done so when they reached the place of the accident in Daniels Canyon about 33 miles east of Heber City, Utah. As they approached that place, the sun suddenly blinded the driver, and he proceeded for about 200 feet without being able to see the road, at which time he applied the brakes because he could feel loose gravel and the car shaking. By this time he had reached the edge of an embankment and the car tipped over causing serious injuries to Nellie Dowsett, the appellant. At the time of the accident, the car was being driven about 35 miles per hour and Nellie Dowsett was talking to the people in the back seat and her head was turned in that direction, so she was unaware of the fact that the sun had suddenly blinded her husband so that he could not see the highway.

Appellant contends that her husband who was driving the car at the time of the accident was the agent of the respondent, their son, and therefore, respondent is liable to her for the driver's negligence which caused the accident. At the conclusion of appellant's case, respondent moved the court for a directed verdict on the ground, among others, that appellant was a fellow servant of the driver and, therefore, was precluded from recovering for injuries sustained on account of his negligence, if any. The court granted the motion, and this appeal is from the verdict and judgment entered of no cause for action.

Appellant contends that the court erred in finding that she and the driver of the car were fellow-servants because

the relationship of master and servant arises out of a contract of employment and there was no contract of employment between respondent and appellant and the driver. She contends that the relationship was consensual and not based on contract and respondent had no right to control the acts of either the driver or appellant as to how the car was to be driven or as to what route was to be taken. She argues that "right to control" is a missing element in this case and, therefore, she could not be a fellow servant, but, like the driver, was an agent of respondent. Respondent concedes that the facts disclose that he had no right of control over appellant or the driver but argues that because he did lack the right to control his agents that he was not responsible for any act of negligence of his agent, the driver, which caused the injuries, because such responsibility is based on the doctrine of respondeat superior or the liability of the master for the acts of the servant or agent whose physical acts he controls or has a right to control.

In the Restatement of the Law on Agency, Vol. 1, Sec. 220, page 483, a servant is defined as a ██

"person employed to perform service for another in his affairs and who with respect to his physical conduct in the performance of the service, is subject to the other's control or right to control."

If there is no control or right of control in the relationship, a person is not a servant and the principal would not be liable for his acts. See page 485 wherein it is stated in comment c:

"It is important to distinguish between a servant and an agent who is not a servant, since ordinarily a principal is not liable for the incidental acts of negligence in the performance of duties committed by an agent who is not a servant (See Sec. 250) * * * The important distinction is between service in which the actor's physical activities and his time are surrendered to the control of the master, and service under an agreement to accomplish results or to use care and skill in accomplishing results. *Those rendering service but retaining control over the manner of doing it are not servants.* They may be agents, agreeing only to use care and skill to accomplish a result and subject to fiduciary duties of loyalty and

obedience to the wishes of the principal; or they may be persons employed to accomplish or to use care to accomplish physical results, without fiduciary obligations, as where a contractor is paid to build a house. *An agent who is not subject to control as to the manner in which he performs the acts that constitute the execution of his agency is in a similar relation to the principal as to such conduct as one who agrees only to accomplish mere physical results. For the purpose of determining liability, they are both 'independent contractors' and do not cause the person for whom the enterprise is undertaken to be responsible * * *.*" (Emphasis ours.)

If respondent had no right of control over the driver of his car, the court did not err in directing a verdict of no cause of action. As shown above, a principal cannot be held responsible for the torts of his agent where he has no right of control over that agent. Regardless of whether the driver of the car and appellant were fellow servants, the court was right in directing a verdict since, in any event, appellant would not be entitled to a judgment against respondent for the injuries she sustained, and although the court may have assigned an incorrect reason for directing the verdict, the direction was correct.

Affirmed. Costs to respondent.

PRATT, C. J., and LATIMER and McDONOUGH, JJ., concur.

WOLFE, Justice (concurring).

I concur in the holding that the doctrine of respondeat superior was not applicable here because Darwin Dowsett was not as to either Nellie Dowsett, Harold Dowsett or Mrs. Darwin Dowsett in a relationship which would make the doctrine applicable.

The very doctrine itself has been subject to criticism by competent scholars. See Holmes, "Agency" (1891), 4 Harvard Law Review, 345-84; 5 Harvard Law Review 1-23, published in Selected Essays in Anglo-American Legal His-

tory Vol. III. Holmes thought its origin could be traced to the patria protectas of the Roman law. He had no use for this anomaly of responsibility without fault.

Professor Wigmore in his "Responsibility for Tortious Acts: Its History" (1894), 7 Harvard Law Review, 315, 383, 441, traces the origin of the doctrine of respondeat superior to the

"primitive notion which instinctively visits liability on the visible offending source, whatever it be, of a visible result * * *. The notion as applied to persons is that of the schadliche Mann, a person from who some evil result has proceeded."

Professor Douglas, now Mr. Justice Douglas, thought that no satisfactory explanation of the origin of the doctrine had yet been given.

I cite these brief comments in order to show that the doctrine has been not only "a healthy and stubborn orphan of the law," but that it owes modern support essentially to public policy. See Wigmore's essay, supra; Professor Seavey, "Respondeat Superior," Harvard Legal Essays (1934) 435; Laski, *"The Basis of Vicarious Liability"* (1916), 26 Yale L. J. 105.

But how far this public policy should be carried in the master and servant and principal and agent relationship gave the old common law judges much concern. The so-called relationship of independent contractor, at bottom a type of master and servant relationship, really grew out of the felt necessity of not extending the doctrine of respondeat superior beyond the point to which it had been carried and involved a recession from the furthermost point to which it had been carried. See Determination of Employer-Employee Relationships in Social Legislation, Columbia Law Review, Vol. XLI (June 1941) at page 1021, from which I quote my own language:

"In early common law development, the master and servant category included almost all service relationships. The conception of an independent contractor, not so-called until later, dates back not much

before *Bush* v. *Steinman*, in 1799. There the court was confronted with the practical problem of whether C, who negligently caused harm, was the servant of A or the servant of B, where there was a contract relationship between A and B. In this and later cases, the prevailing doctrine of respondeat superior was applied to hold A or B, but not both, responsible. The doctrine of independent contractorship was developed as a solution of this problem. There was no deliberate intent to create a new relationship—rather it developed gradually to fill an apparent need for selecting the right defendant in such triangular situations.

"Essentially the difficulty was in determining whether A, having hired B (B having an independent calling) to do a definite job or piece of work should be responsible for the acts of C, hired by B. This required a preliminary decision as to whether C was A's servant or B's. The courts, after holding C to be B's servant, decided that the harm was caused, if at all, only remotely by A; in other words there was an intervening cause which broke the chain of direct causation between A and C. The intervening cause was the circumstance that B was in the pursuit of an independent calling. In effect, therefore, the doctrine of independent contractorship was unconsciously developed as a mechanism to evade the rigors of the ancient doctrine of respondeat superior.

"Throughout the growth of ethico-legal distinctions among accident (no liability), fault through carelessness (tort), and design (crime), i. e. the development of classifications based on different mental states, the liability of the master for the acts of his servant still persisted though the servant may have chosen with great care and acted in a fashion contrary to the master's desire or instruction. Between 1500 and 1600 the law attempted to confine the master's liability to the Particular Command, that is, 'the master to be liable must have commanded (or assented to) the very act in which the wrong consisted,' unless it were a command to do a thing in itself unlawful. But with the industrial era experience dictated the policy of holding the employer for the torts of his employee when acting within the scope and in the furtherance of his master's business. Under the guiding genius of Lord Holt, the technical requirement of Particular Command was logically met by implying it from the General Command or authority.

"So by 1800 through the Implied Command, the doctrine of respondeat superior was thoroughly ingrained as a policy in English law. It is at this point that we first meet with independent contractorship. While the situations presented to the courts were definitely ones in which it seemed unfair to impose liability by respon-

deat superior, the new relationship was not consciously invented to escape responsibility.

"The independent contractor, conceived as someone engaged in a separate and independent calling and exercising that calling while producing an agreed result for the employer, actually did stand in a different conceptual relation to the employer than did the ordinary servant or employee. The difference was that he was in the pursuit of his calling and for this reason the employer did not have control as to the manner of performance. The independent contractor was in what we have called an 'own business' relationship.

"In the growing complication of life, new relationships arise different in nature from those which we are familiar, long before we recognize the difference. We continue to allude to them under the old generic name. As has been pointed out, there were relationships developing where the discretion of the agent was an ever-widening one and as the economic life became more complicated, special callings increased. Men did less of their own increasingly diversified tasks. The relation of independent contractor, while conceptually developed in the field of tort, was in fact earlier recognized in some of its other legal aspects, although not given that name. Certainly the servant of A, where A was himself engaged by B to achieve a definite result could not sue B for wages unless, of course, A was found to be the agent of B with authority to hire for him. This situation was recognized in its contractual aspects, B not being indebted to the servant because he had not hired him.

"Earlier the courts had not resorted to the rationale that the acts of the negligent actor were remote from the person who had contracted with the actor's employer, so as to break the chain of cause and effect from that person to the actor. Rather they evolve a limitation on the doctrine of respondeat superior by finding that the negligent actor was not the servant of the ultimate employer, B, but the servant of one whose relationship to such employer was in a new and different category, in time dubbed independent contractorship.

"If the judges could have projected themselves a hundred years into the future and from that vantage point have surveyed their own work, they might have seen fit to modify the policy of respondeat superior in certain instances without devising a relationship to create an exemption from the doctrine. But judge-made law has the disadvantage that it only grows from case to case, from situation to situation.

"The element which distinguished independent contractorship from the master-servant relationship was the absence of the right of control over the performance. The reason why in certain situations

the 'employer' did not have such right of control was that in those situations the other party to the contract was engaged in an independent calling while he was accomplishing the result for which the other had employed him."

It may appear that I have unnecessarily taken an excursion into the nature and origin of the doctrine of respondeat superior to no useful purpose, since it has now become a matter of public policy to hold the master responsible for the torts of his servants committed in the course of his business. But I have done so because I think it necessary to realize that the relationship of independent contractor was given recognition in an attempt to cut down this responsibility of the master. The next step then is to call attention to the fact that where, as here, someone does something for another as a favor or as an accommodation or for the mutual benefit of both parties where there is no right of control, and where it is apparent that it is not within the realm where public policy dictates that the non-actor party should be held on the doctrine of respondeat superior, we might press the relationship into that of independent contractorship even though it does not seem to have all the aspects of that relationship.

I rather think this case could be decided on principles applicable to bailments. The elder Dowsetts were bailees for the mutual benefit of Darwin and themselves. He wanted his car, and they wanted to visit him and visit with their daughter enroute. Certainly the fact that one of the bailees, if by negligent driving injured the other, would not make the bailor liable. Or it may have both the aspects of bailment and independent contractorship. In any event, I agree that the result is proper whether we fit it in the mould of bailment or independent contractorship or both.

I therefore concur.