William H. CLONINGER, Plaintiff-Appellant,

v.

James WOLFE, Defendant-Respondent,

and

William L. Larson, a/k/a Wilbur L. Larson, Defendant.

No. 9107.

Missouri Court of Appeals, Springfield District.

Feb. 9, 1972.

Motion for Rehearing or to Transfer to Supreme Court Denied Feb. 24, 1972.

Application to Transfer Denied April 10, 1972.

---

Horace S. Haseltine, Haseltine & Springer, Springfield, Harvey B. Cox, Jr., Cox, Cox, Cox, McEnery & Wallace, St. Louis, for plaintiff-appellant.

Amos Wight, Ewing, Ewing, Carter, Wight, Woodfill & Middleton, Nevada, Robert L. Ross, Columbia, for defendant-respondent.

TITUS, Chief Judge.

A farm-type tractor owned by Wolfe and operated by Larson, either slid or was driven backward down a paved lakeside launching ramp and injured Cloninger who subsequently sued Wolfe and Larson for $50,000 damages. A jury could not agree on a verdict, and within fifteen days after it was discharged Wolfe moved for judgment in accordance with his motion for a directed verdict made at the close of all the evidence. V.A.M.R. 72.02. The motion was sustained and judgment entered accordingly. Thereafter, by leave of court, Cloninger filed an amended petition wherein he averred his damages were $25,-000. Larson answered this pleading but did not appear in person or by counsel when the cause was court-tried and a $25,000 judgment for Cloninger was entered against Larson. The lone appeal in this case is by Cloninger from the judgment entered in favor of Wolfe and the dispositive question is whether a jury, rather than a court, should decide if Larson was a servant of Wolfe at the time of the casualty so as to make Wolfe liable for Larson's alleged negligence under the doctrine of respondeat superior.[1]

In determining whether the trial court erred in entering judgment for Wolfe as asked in his motion for a directed verdict, we are bound to consider and recast the testimony in the light most favorable to Cloninger's point of view and afford him the benefit of every reasonable and favorable inference which the evidence tends to support. Mathes v. Trump, Mo., 458 S.W.2d 297, 298(1), and cases collected in 3A West's Missouri Digest, Appeal and Error,

Wolfe was the prime concessionaire at a public park and recreational area on Table Rock Reservoir known as the Highway 13 Boat Dock. His primary responsibility was to police and maintain the facilities provided for camping and picnicking . Immediate-

1. The question of our appellate jurisdiction in this matter was decided in Cloninger v. Wolfe, Mo.App., 474 S.W.2d 40.

ly adjacent to the lake in the area was a sloping ramp available to the public for use in launching boats from trailers and retrieving them from the water. It was "a regular occurrence" for vehicles operated on the ramp to become stalled or disabled. There was no evidence contradicting Wolfe's disavowal of any legal or contractual responsibility to assist people with such vehicles, but he allowed that "many times" of his own "free will" he had used his Jeep or tractor to aid people whose cars and trailers became "hung up" on the ramp or in the water—"I don't think I ever refused to help a man if he asked for help." Larson was not in the general employ of Wolfe for any purpose and, at the time of the accident in question, Larson had no official "relationship with this Highway 13 Boat Dock area."

Cloninger had gone to the area to "camp and fish," and while enroute on foot from his tent site to a cafe, he encountered Ollie Kitch whose station wagon, with boat and trailer in tow, was disabled on the launching ramp. Kitch requested Cloninger's assistance. Cloninger explained that his pitched tent was attached to his pickup truck but that he, nevertheless, would assist with his vehicle if other help was not available. A rope was then obtained by Cloninger from his truck and he, together with Kitch, tied the rope to the front of the station wagon so that "whatever they pulled his car with they could use this." Upon returning from the cafe some twenty minutes later, Cloninger found the scene at the ramp and Kitch's predicament unchanged. Kitch stated that he had asked "the man at the boat dock," located 150 yards from the ramp, for help and opined, " 'but I believe he's forgot about me.' " While Kitch remained at the ramp, Cloninger went to the office at the boat dock and talked to Wolfe who said, " 'I just forgot about it, I'll pull him right now.' " Wolfe and Cloninger then went outside to the location of a Ford tractor to which was attached a brush hog. Wolfe went to a

truck, secured a log chain, returned to the tractor and told Cloninger, " 'We will use this to pull him out with.' " In response to Cloninger's inquiry, Wolfe said it would not be necessary to detach the brush hog and that Cloninger could " 'just hook [the chain] on the [two channels on the brush hog], they are plenty substantial.' " About this time Larson arrived and asked what they intended doing. Upon being informed of the proposed mission, Larson reminded Wolfe that he had just gotten out of the hospital following surgery and admonished Wolfe that "you shouldn't be driving a tractor . . . Why don't you let me?" After ascertaining that Larson could operate the tractor, Wolfe said, " 'Well, you go pull him and I'll stay here.' " Wolfe went back into the office. Cloninger, with the log chain in his hand, got onto the shroud of the brush hog and rode in that position to the launching ramp with Larson driving the tractor.

Upon arriving at the launching ramp, Cloninger stepped off the brush hog, walked to the station wagon and was in the process of tying his rope to the log chain when struck by the brush hog. It was Cloninger's theory that Larson had negligently backed the brush hog against him; Larson claimed that the tractor and brush hog slid backward down the ramp which had been made slippery by a recent application of oil.

■ The many evidentiary circumstances and elements that are to be considered in determining the existence vel non of the master-servant relationship have been fully detailed and discussed so often that we need not repeat them here. See Mattan v. Hoover Company, 350 Mo. 506, 516–517, 166 S.W.2d 557, 564–565 (3–5), and cases cited; Jokisch v. Life and Casualty Insurance Co. of Tenn., Mo.App., 424 S.W. 2d 111, 114(5). Other relationships will usually have some characteristics of master and servant alliances (Griffin v. Sinks Ford Sales, Mo.App., 413 S.W.2d 856, 858); for this reason it is often said that no one

of the sundry elements which enter into a determination of the actual master-servant relationship is alone conclusive, and that all must be viewed to see whether control, or a right of control has been retained over the alleged servant's physical conduct and details of the work. Talley v. Bowen Construction Company, Mo., 340 S.W.2d 701, 704(3). Generally speaking, a servant is one who is employed by a master to perform services in his affairs and whose physical conduct in the performance of those services is controlled or subject to the right of control by the master. Madsen v. Lawrence, Mo., 366 S.W.2d 413, 415(2). The ultimate test in determining whether a person is a servant or bears some other relationship to the supposed master is whether the latter had the right to exercise control over the details of the servant's work [Gardner v. Simmons, Mo., 370 S.W. 2d 359, 362(5)]; if one renders service to another and retains control over the manner of doing it, then he is not a servant. Stokes v. Four-States Broadcasters, Mo., 300 S.W.2d 426, 430; Usrey v. Dr. Pepper Bottling Company, Mo.App., 385 S.W.2d 335, 339(7).

If it was proper, which it is not, to accept out of context the statement appearing in Andres v. Cox, 223 Mo.App. 1139, 1147 (7), 23 S.W.2d 1066, 1069(7), that "One who drives a car as a mere accommodation or favor to the owner of the car is the servant of the owner," our task would be eased although, as noted in Arditi v. Brooks Erection Co., Mo., 266 S.W.2d 556, 558, *Andres* did not hold the driver was a servant of the owner as a matter of law. As illustrated by Ridge v. Jones, 335 Mo. 219, 229, 71 S.W.2d 713, 717, which distinguished itself from *Andres* on the controlling facts, something more than consent and permission of and benefit to the owner of a vehicle is required to render him liable for the conduct of the driver under the doctrine of respondeat superior. 60A C.J.S. Motor Vehicles § 436(1), at pp. 993–994. Moreover, it would be improper to predicate a decision on only one or two matters of fact, when many others must be considered in ascertaining the determining factor, which is the right of control. Barsh Truck Line, Inc. v. Jerry Lipps, Inc., Mo. App., 424 S.W.2d 81, 83. Comment e on Subsec. (1), § 220, 1 Restatement (Second) of Agency, pp. 487–488 (see also Comment c on Subsec. (1), § 220, 1 Restatement of the Law of Agency, p. 485) states: "It is important to distinguish between a servant and an agent who is not a servant, since ordinarily a principal is not liable for the incidental physical acts of negligence in the performance of duties committed by an agent who is not a servant. . . . The important distinction is between service in which the actor's physical activities and his time are surrendered to the control of the master, and service under an agreement to accomplish results or to use care and skill in accomplishing results. Those rendering service but retaining control over the manner of doing it are not servants."

We consider the following reported authorities to be most relevant to the circumstances at hand. In each of these cases it was ruled, as a matter of law, that the master-servant relationship did not exist at the time of the concerned casualty. In Stokes v. Four-States Broadcasters, supra, 300 S.W.2d 426, Londo was in the general employ of a broadcaster and worked at its transmitter station. Although not required to by the terms of his employment, Londo frequently went to the studio, secured a copy of the schedule of the following day's broadcasts and took it to the transmitter in his own car on the way to work. At the time of the accident in suit, Londo was enroute to work with a schedule in his car. At l. c. 429–430(5), the Supreme Court said: ". . . the evidence is not sufficient to reasonably authorize an inference that the legal relationship of master and servant existed between the [broadcaster] and Londo at the time of the accident in respect to the very transaction out of which plaintiff's

injury arose. In reaching the foregoing conclusion we have considered the casual and incidental nature of the service Londo was performing in its relation to the failure of plaintiff to show that [the broadcaster] was exercising any control or had any right to control the physical movements of Londo at the time of this occurrence, which omission we consider decisive of the issue before us. . . . The [facts] tend to indicate that the act of Londo in 'picking up' the schedule with more or less regularity was a casual, gratuitous act which he performed · when necessary and convenient, at a time of his own choosing." Hamrick and Miller, as they appear in Miller v. Query, 201 Va. 193, 110 S.E.2d 198, 201–202(2, 3), 82 A.L.R.2d 912, 917(5–6), were shipmates in the Navy and Hamrick was a guest in Miller's home. Upon taking his departure, Hamrick found his car would not start and asked Miller to give him a push. While this was in progress, the accident occurred. The Supreme Court of Appeals of Virginia stated: "Hamrick wanted the motor of his car started. Miller had no interest in the matter, save to aid a friend in distress. There was no community of interest between Miller and Hamrick. . . . Miller merely complied with the request of Hamrick for aid. The assistance given by Miller was nothing more than a social act of courtesy strictly accommodational, not one of business or of community of interest, and agency does not arise out of such a relation." The owner of the automobile which figured in the casualty reported in Dowsett v. Dowsett, 116 Utah 12, 207 P.2d 809, 811(2–3), was stationed at Camp Maxey, Texas. His wife, mother, father and automobile were in Utah. The owner telephoned his wife to join him in Texas and bring his car. Knowing that she could not drive and that his parents could, he told her to ask his parents to drive the car to Texas and bring her along. The owner's parents consented to the request and on the trip, while the father was driving, the car ran off the road and the mother was injured. Mother sued the owner claiming the father was the owner's servant at the time of the casualty. It was held that the owner "had no right of control over the driver of his car . . . a principal cannot be held responsible for the torts of his agent where he has no right of control over that agent." Miller v. Ellis, 188 Va. 207, 49 S.E.2d 273, and Redd v. Brisbon, 113 Ga.App. 23, 147 S.E.2d 15, concern similar situations and holdings.

■ In the instant case, as already said, no general employment by Wolfe of Larson existed. No business relation was present between them and no fiduciary obligations were owed by Larson to Wolfe, or vice versa. Larson's arrival on the scene occurred by sheer chance. No payment of compensation for anything that Larson was to do appears to have been contemplated, and no pecuniary benefit inured to the benefit of either Wolfe or Larson out of the transaction. Larson's concern over the advisability of Wolfe running the tractor while he was recovering from surgery, bears every appearance and color of neighborly solicitude; his offer to drive the tractor as a substitute for Wolfe was not prompted because of any duty owing to Wolfe as his master, but was due to apprehension of the adverse physical consequences that might befall a friend and acquaintance. Conceding, as stated by Cloninger, that Larson drove the tractor at Wolfe's direction or asking, what Larson did was no more of a submission to direction and asking than Cloninger's acceptance of instructions from Wolfe "[t]o hook the chain on the . . . brush hog" when it was contemplated that Wolfe and Cloninger (later Larson and Cloninger) were going to combine their efforts to pull the station wagon off the launching ramp. Wolfe had no right to control Larson's conduct and Larson would have suffered nothing had he not volunteered to drive the tractor or had not driven the tractor. Since there was no employment, there was nothing upon which any power of discharge could have operated.

While it may be said that Wolfe may have anticipated some remote or indirect benefits from his good Samaritan deeds to motorists stranded on the launching ramp, the performance of these deeds would have benefited the motorists more directly and substantially than they did Wolfe. We see nothing in the circumstances in this case to indicate that Wolfe and Larson believed they were creating the relation of master and servant. The act of Larson in driving the tractor was a one-time gratuity, and as it seems clear that Wolfe did not control or have any right to control Larson's physical movements on the single occasion in question, the trial court was correct in entering a judgment for Wolfe and its action in this respect is affirmed.

STONE and HOGAN, JJ., concur.