**WARDLEY CORPORATION, Plaintiff, Appellee, and Cross-appellant,**

v.

**Grant WELSH, Defendant, Appellant, and Cross-appellee.**

No. 970401–CA.

Court of Appeals of Utah.

July 2, 1998.

Vincent C. Rampton, Salt Lake City, for Appellant.

Neil R. Sabin and Annette F. Sorensen, Salt Lake City, for Appellee.

Before GREENWOOD, JACKSON and ORME, JJ.

## OPINION

JACKSON, Judge:

Grant Welsh appeals both the trial court's entry of partial summary judgment for Wardley Corporation and the trial court's later judgment for Wardley following a trial held on December 16, 1996. Wardley cross-appeals regarding the trial court's denial of its request that Welsh pay its attorney fees. We affirm.

## BACKGROUND

Welsh, a developer, owned a parcel of land at about 4800 West and 8400 South in West Jordan, Utah (the parcel). Randy Young, a licensed real estate sales agent, worked for Wardley, a real estate brokerage. Young asked Welsh if he had any property to sell. Welsh replied he wanted to sell the parcel, but would not list it with Young as Young had asked. Welsh stated that he needed to

net $18,500 per acre from selling the parcel and that Young could receive a commission for sending Welsh a buyer.

Young introduced Welsh to Leon Peterson. Young was not present when Welsh and Peterson later entered a purchase agreement, in which Peterson agreed to buy the parcel from Welsh. In the purchase agreement, Welsh inserted as item twelve of addendum one the following handwritten language: "While Wardley BH & G has no agency relationship with neither [sic] the Seller nor [sic] the Buyer, the Seller agrees to pay $500.00 per acre to Wardley BH & G[ ] at settlement."

Welsh paid the five-hundred-dollar-per-acre commission to Wardley on the first set of lots he sold to Peterson under the purchase agreement. Welsh and Peterson then had a dispute about some of the purchase agreement's terms. Young became involved in their negotiations to some degree. During this time, Welsh sent Young a letter, stating, "I would like to remind you that you do not represent me in any way whatsoever, nor do you maintain any kind of an agency relationship with me, whatsoever." Welsh and Peterson later resolved their dispute through another written agreement. When Welsh then conveyed the remaining two sets of lots to Peterson, he refused to pay Wardley a commission.

Wardley sued Welsh for the five-hundred-dollar-per-acre commission described in the purchase agreement. Wardley further asserted a claim for attorney fees based upon the following term in the purchase agreement: "In any action arising out of this Contract the prevailing party shall be entitled to costs and reasonable attorney's fees." Welsh responded that he need not pay a commission to Wardley because he alleged Wardley, as his purported agent, breached fiduciary duties toward him, Wardley did not disclose a purported agency relationship with Welsh or a purported dual agency relationship with Welsh and Peterson, as required by statute and rule,[1] and Wardley's claim for commission was the result of an illegal "net listing." [2]

On Wardley's motion, the trial court granted partial summary judgment to Wardley, ruling that (1) Wardley had no agency relationship with Welsh; (2) Wardley owed Welsh no fiduciary duties; (3) Young was a "coordinating agent," or finder, not a dual agent with disclosure duties; and (4) a question of material fact existed as to whether Young had taken a "net listing" in violation of the administrative rules.

After trial on the single issue of whether a net listing existed, the court determined that Welsh never listed the parcel with Young and, without a listing, there could be no net listing. The trial court thus awarded Wardley the commission it sought. The trial court then denied Wardley attorney fees under the contract, reasoning that the contract was ambiguous as to attorney fees for nonsignato-

---

1. A licensed real estate broker or sales agent may be sanctioned for "violating or disregarding [the chapter governing the Division of Real Estate], an order of the [Real Estate C]ommission, or the rules adopted by the commission and the division." Utah Code Ann. § 61–2–11(15) (Supp. 1997). The administrative rules contain several disclosure requirements, which are listed in footnote six.

2. The Utah Division of Real Estate has made a rule that "[n]et listings are prohibited and shall not be taken by a licensee." Utah Admin. Code R162–6.1.4.1 (1997). A "net listing" is "a listing wherein the amount of real estate commission is the difference between the selling price of the property and a minimum price set by the seller." Id. R162–1.2.11.

Welsh's refusal to pay commission based on alleged violations of the Utah Code and administrative rules regulating the Division of Real Estate is based upon Utah Code Ann. § 61–2–17(4) (1997), which states:

> If any person receives any money or its equivalent, as commission, compensation, or profit by or in consequence of a violation of this chapter, that person is liable for an additional penalty of not less than the amount of the money received and not more than three times the amount of money received, as may be determined by the court. This penalty may be sued for in any court of competent jurisdiction, and recovered by any person aggrieved for his own use and benefit.

Although this section provides for recovery of commission after payment, Welsh argues that it also allows a party to refuse to pay commission in the first place. However, based on our decision that Welsh must pay the commission, we need not consider this issue. The part we quote seems to deal only with payment of penalty and not refund of commission improperly paid.

ries, and Wardley had not presented extrinsic evidence about Welsh's and Peterson's intent to make the provision applicable to Wardley as a third-party beneficiary.

Welsh appeals the trial court's judgment against him for Wardley's commission. Wardley cross-appeals the trial court's denial of its request for attorney fees.

## ANALYSIS

### I. Appeal

#### A. Partial Summary Judgment

Summary judgment is proper when no genuine issues of material fact exist, and the movant qualifies for judgment as a matter of law. *See Wardley Corp. Better Homes & Gardens v. Burgess,* 810 P.2d 476, 477 (Utah Ct.App.1991). Thus, an appeal from a summary judgment contests only legal conclusions, which we review for correctness, with no deference to the trial court. *See id.* We must appraise the evidence in a light most favorable to Welsh, the losing party, and will affirm only if no genuine dispute of material fact exists or if, even based on the facts as argued by Welsh, Wardley wins as a matter of law. *See id.*

Welsh contends that Wardley through Young must have been either his agent or a dual agent of Welsh and Peterson, and thus owed him statutorily required fiduciary duties[3] and written disclosures about their agency relationship(s). According to Welsh, these requirements were not met, and he therefore may refuse to pay Wardley's commission. Wardley rejoins that under the undisputed facts it was not Welsh's agent, but merely found Welsh a buyer and therefore owed Welsh no fiduciary or disclosure duties. We agree with Wardley.

 The key relationship between a real estate broker and a client is agency, and the

universal laws applying to principals and agents control their rights and responsibilities. *See Beech Acceptance Corp. v. Connell,* Nos. 88–1080–C, 88–1575–C, 1990 WL 193824, at \*5, 1990 U.S. Dist. LEXIS 16309, at \*14 (D.Kan. Nov. 8, 1990). Agency is "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1(1) (1958). Thus, for Welsh to show Wardley was his agent, he must prove that (1) he manifested that Wardley could act for him, (2) Wardley accepted the proposed undertaking, and (3) both Welsh and Wardley understood that Welsh was to be in charge of the undertaking. *See id.* § 1(1) cmt. b (1958). In other words, "an agency is created and authority is actually conferred very much as a contract is made": a meeting of the minds must exist between the parties. 3 Am.Jur.2d *Agency* § 17 (1986). Moreover, and critical in this case, "[a]n agency relationship can arise only at the will and by the act of the principal." *Id.*

 These principles doom Welsh's arguments. He presented no facts showing he consented to or created an agency relationship with Wardley. First and foremost, he twice clearly disclaimed in writing that Wardley acted as his agent—once in the purchase agreement between Welsh and Peterson and later in the letter he wrote to Young. Second, the only other facts to which he refers us relate to how others perceived his relationship with Wardley and Young. For example, Welsh notes that Young stated in his deposition that he "represented both parties," and that Young's supervisor stated that if Young had made that statement, she would assume that Young acted as a "limited agent."[4] He further points out that Peterson may have thought Young was Welsh's agent until Welsh disavowed that relationship when Welsh and Peterson

---

**3.** A licensed broker or real estate sales agent violates the law when he or she breaches the fiduciary duty a licensee owes *"to his principal* in a real estate transaction." Utah Code Ann. § 61–2–11(16) (Supp.1997) (emphasis added). The Real Estate Commission's rules set forth the specific fiduciary duties owed to seller and buyer principals. *See* Utah Admin. Code R162–6.2.16 (1997).

**4.** A "limited agent," or "dual agent," is a broker "who act[s] as agent for both seller and buyer." Utah Admin. Code R162–6.2.16.3 (1997). A limited agent must disclose to both the seller and buyer that they are entitled to choose their own agent and will forego certain fiduciary duties if they each use the same agent. *See id.* R162–6.2.16.3.1.

drafted the purchase agreement. However, others' perceptions are irrelevant. Only Welsh's actions regarding his relationship with Wardley and Young matter. And, Welsh has not met his burden by setting forth any facts showing that he acted to authorize Wardley as his agent. *See Beech Acceptance Corp.,* 1990 WL 193824 at *5, 1990 U.S. Dist. LEXIS 16309, at *15 ("[T]he burden of establishing agency is upon the party asserting it.").

■■■■ Without an agency relationship, Wardley had neither fiduciary nor disclosure duties toward Welsh.[5] Indeed, both sets of duties flow directly from the establishment of agency. *See Hal Taylor Assocs. v. Unionamerica, Inc.,* 657 P.2d 743, 748 (Utah 1982) ("As an agent, [a real estate broker] owes a fiduciary duty to his principal."); Utah Admin. Code R162–6.1.11, –6.1.11.1, –6.1.11.3, – 6.2.7, –6.2.7.1, –6.2.16.1, –6.2.16.2 (1997) (basing need for agency disclosure on existence of agency relationship)[6]; Restatement (Second) of Agency § 1(1) (1958) (defining agency as "fiduciary relation").[7]

We therefore conclude the trial court correctly granted summary judgment for Ward-

5. In *Hal Taylor Associates. v. Unionamerica, Inc.,* 657 P.2d 743 (Utah 1982), the supreme court stated,

> A fiduciary or confidential relationship may be created by contract or by circumstances where equity will imply a higher duty in a relationship because the trusting party has been induced to relax the care and vigilance he would ordinarily exercise. In such a case, the evidence must demonstrate the placement of trust and reliance such that the nature of the relationship is clear.

657 P.2d at 748.

We have already decided that Wardley had no contractual agency relationship with Welsh. Further, this case does not involve circumstances in which equity implies "a higher duty." *Id.* After all, Welsh admitted in trial testimony that not only was he a licensed real estate broker and sales agent himself, but he actually taught real estate training classes. In fact, he met Young while teaching a class Young attended. Certainly, he proved himself to be a sophisticated consumer of real estate services by specifically and repeatedly refusing listing arrangements and denying the existence of an agency relationship with Young. He was not a "trusting party ... induced to relax the care and vigilance he would ordinarily exercise." *Id.*

6. Rule 162–6.1.11 reads:

> To avoid representing more than one party without the informed consent of all parties, principal brokers and licensees acting on their behalf shall have written *agency* agreements *with their principals.* The failure to define an *agency relationship* in writing will be considered unprofessional conduct and grounds for disciplinary action by the division.

Utah Admin. Code R162–6.1.11 (1997) (emphasis added).

Rule 162–6.1.11.1 reads: "A principal broker and licensees acting on his behalf *who represent a seller* shall have a written agency agreement with the seller defining the scope of the *agency.*" *Id.* R162–6.11.1 (emphasis added).

Rule 162–6.1.11.3 reads:

> A principal broker and licensees acting on his behalf *who represent both buyer and seller* shall

have written agency agreements with both buyer and seller which define the scope of the limited *agency* and which demonstrate that the principal broker has obtained the informed consent of both buyer and seller to the limited *agency* as set forth in Section R162–6.2.16.3.1 [*see supra* note 2].

*Id.* R162–6.1.11.3 (emphasis added).

Rule 162–6.2.7 reads:

> In every real estate transaction involving a licensee, *as agent or principal,* the licensee shall clearly disclose in writing to the buyer and seller, lessor and lessee, his *agency relationship(s).* The disclosure shall be made prior to the buyer and seller, lessor and lessee entering into a binding agreement with each other. The disclosure shall become part of the permanent file.

*Id.* R162–6.2.7 (emphasis added).

Rule 162–6.2.7.1 reads:

> When a binding agreement is signed in a sales transaction, the prior agency disclosure shall be confirmed in a separate provision incorporated in or attached to that agreement, which shall be as follows:
>
> "AGENCY DISCLOSURE: At the signing of this contract, the listing agent *represents* ( )Buyer ( )Seller, and the selling agent *represents* ( )Buyer ( )Seller. Buyer and Seller confirm that prior to signing this contract written disclosure of the *agency relationship(s)* was provided to him/her. ( ) (Buyer's initials) ( ) (Seller's Initials)."

*Id.* R162–6.2.7.1 (emphasis added).

As an aside, we note that Young was not in a position to present Welsh with agency disclosures after being told unequivocally that Welsh did not want Young as his agent, nor was he in a position to attach written disclosures to the purchase agreement as he was not even present when the agreement was made.

7. We here treat two other issues peripheral to those discussed in the text. First, Welsh forwards a fairly novel argument that an agency relationship arose between himself and Wardley based on the Utah Code governing the Division of Real Estate. *See* Utah Code Ann. §§ 61–2–1

ley regarding the nonexistence of an agency relationship between Wardley and Welsh and the consequent nonexistence of fiduciary and disclosure duties owed by Wardley to Welsh.

### B. Trial—Net Listing

■ Welsh next argues that the agreement between Welsh and Wardley involved an illegal net listing, *see supra* note 2, which would be a violation of the administrative rules and a possible basis upon which to deny Wardley its commission. As we have already noted, "net listing" is defined as "*a listing* wherein the amount of real estate commission is the difference between the selling price of the property and a minimum price set by the seller." Utah Admin. Code R162–1.2.11 (1997) (emphasis added). The trial court ruled that because there was no listing—or agency relationship—to begin with, there could be no net listing. In fact, in his reply brief Welsh concedes that "a net listing contemplates an agency relationship

between the owner and the broker/agent." He then proceeds to reargue that Wardley was his agent. Based on Welsh's arguments and concessions on appeal, and because we have affirmed the trial court's conclusion that Wardley was not Welsh's agent, we also affirm the trial court's determination that Wardley did not accept an illegal net listing. Accordingly, we affirm the trial court's judgment awarding Wardley's commission.[8]

### II. Cross–Appeal—Attorney Fees

Wardley cross-appeals the trial court's denial of its request for attorney fees. Wardley's request is based on the following language of the purchase agreement between Welsh and Peterson: "In any action arising out of this Contract, the prevailing party shall be entitled to costs and reasonable attorney's fees." As a third-party beneficiary of the purchase agreement, Wardley has successfully sued for its commission based on the addendum to the purchase agreement.

to –24 (1997 & Supp.1997). He specifically contends that because Young's involvement in this transaction falls within the statutory definition of "real estate sales agent," Young must have acted as his agent. The definition of real estate sales agent includes "any person employed or engaged as an independent contractor by or on behalf of a licensed principal real estate broker to," *id.* § 61–2–2(15) (1997), "assist[ ] or direct[ ] in the procurement of prospects for or the negotiation of [real estate transactions]," *id.* § 61–2–2(12)(d). However, Welsh confuses the definition of real estate sales agent for purposes of bringing certain activities within the purview of the licensing requirements with the specific contractual relationship governing a specific agent/principal relationship. We thus clarify that the fact that Young's act of finding a buyer for Welsh's property fit within the statutory definition of real estate sales agent—essentially requiring Young to be licensed to sue for a commission—does not automatically make Young Welsh's agent. This is particularly true as Welsh did not even want Young/Wardley to be his agent. The statute plainly does not operate to force an agency relationship on an alleged principal.

Second, we are unpersuaded by Welsh's argument that Utah law disallows brokers and agents to act as mere finders. First, the above excerpt from the definition of real estate sales agent describes finding activities. Second, none of the language describing agency disclosure requirements, *see supra* note 6, professes to limit broker or agent/seller or buyer relationships to those involving an agency. Rather, disclosure requirements pertain only to those relationships involving an agency. Third, several of our cases dis-

cuss the inclusion of mere finding activities within those requiring licensure, without questioning whether a broker or agent may act as a mere finder. *See Andalex Resources, Inc. v. Myers*, 871 P.2d 1041, 1045 & n. 6 (Utah Ct.App. 1994) (stating that "[t]he legislature clearly intended the licensing requirements to apply to 'finders,' " and that "[t]he act of finding or locating a prospective buyer falls within the reach of the broker licensing statutes"); *Machan Hampshire Properties, Inc. v. Western Real Estate & Dev. Co.*, 779 P.2d 230, 234 (Utah Ct.App. 1989) ("[This statute] applies broadly to agreements requiring compensation for brokering real estate, including finder's agreements, and not just to contracts employing brokers to purchase or sell real estate for compensation."); *C.J. Realty, Inc. v. Willey*, 758 P.2d 923, 925 n. 1, 927 (Utah Ct.App.1988) (" 'A broker is entitled to a commission when he has performed everything he undertook to perform under his agreement with the seller.' This agreement may simply be to procure prospective buyers.... [T]his is a brokerage agreement subject to the regulatory scheme applicable to real estate brokerage transactions, even though it is only a finder's agreement." (Citation omitted.)).

8. Welsh also appealed the trial court's denial of his motion to amend his answer. However, Welsh's briefing on this issue does not contain an adequate legal argument, including proper legal analysis and citations to authority. *See* Utah R.App. P. 24(a)(9). We thus decline to address this issue. *See PDQ Lube Ctr. v. Huber*, 949 P.2d 792, 797 n. 6 (Utah Ct.App.1997).

Having thus prevailed, Wardley contends, Welsh should pay its attorney fees.

■ "Whether attorney fees are recoverable in an action is a question of law, which is reviewed for correctness." *Selvage v. J.J. Johnson & Assocs.*, 910 P.2d 1252, 1257 (Utah Ct.App.1996). In this state, "attorney fees authorized by contract are awardable only in accordance with the explicit terms of the contract and only to the extent permitted by the contract." *Maynard v. Wharton*, 912 P.2d 446, 451 (Utah Ct.App.), *cert. denied*, 919 P.2d 1208 (Utah 1996). Those requesting an attorney fees award under a contract must show that the contract's provisions contemplate that award. *See id.* To determine whether Wardley was entitled to attorney fees based on the contract between Welsh and Peterson, "we focus on the language of the attorney fees provision." *American Rural Cellular, Inc. v. Systems Communication Corp.*, 939 P.2d 185, 192 (Utah Ct.App.), *cert. granted*, 945 P.2d 1118 (Utah 1997). Further, "we interpret a contract 'so as to harmonize all of its provisions and all of its terms, and all of its terms should be given effect if it is possible to do so.'" *Hi–Country Estates Homeowners Ass'n v. Bagley & Co.*, 928 P.2d 1047, 1053 (Utah Ct.App.1996) (citation omitted), *cert. denied*, 937 P.2d 136 (Utah 1997). And, we recognize that, specific to this case, "[f]or a third-party beneficiary to have a right to enforce a right, the intention of the contracting parties to confer a separate and distinct benefit upon the third party must be clear." *Rio Algom Corp. v. Jimco Ltd.*, 618 P.2d 497, 506 (Utah 1980).

■ The attorney fees provision contemplates an award to "the prevailing *party*." (Emphasis added.) We have examined the contract as a whole and located the words "party" and "parties" in a variety of provisions. In these contract provisions, those words are used in a way that can logically refer only to the direct parties to the contract—Welsh, the seller, and Peterson, the buyer—not to the potentially much larger group of parties to the litigation growing out of the contract. For instance, paragraph

four states: "Unless otherwise agreed in writing by *the parties*, Seller shall deliver possession to Buyer within 12 hours after Closing." (Emphasis added.) Surely Wardley could not rationally argue that it would also have to join in such a written agreement. Paragraph fifteen states: "The *parties agree* that any dispute or claim relating to this Contract ... shall first be submitted to mediation...." (Emphasis added.) Because Wardley was not a signatory to the contract, it could not have agreed to such a term. Finally, paragraph sixteen states: "Where a section of this Contract provides a specific remedy the *parties intend* that the remedy shall be exclusive regardless of rights which might otherwise be available under common law." (Emphasis added.) Likewise, having not participated in, agreed to, or signed this contract, Wardley could not have joined in voicing its intent, along with Welsh and Peterson.

Harmonizing all the terms of this contract, we conclude the words "party" and "parties" refer only to the signatories to the contract— Welsh and Peterson. Only Welsh and Peterson therefore may enforce the attorney fees provision against each other. The plain language shows no intent to benefit Wardley with an award of attorney fees in successfully suing for its commission as a third-party beneficiary. The trial court thus correctly denied Wardley its attorney fees based on the contract.[9]

## CONCLUSION

We conclude the trial court correctly determined on partial summary judgment that Wardley did not act as Welsh's agent and, consequently, owed Welsh neither fiduciary duties nor duties of disclosure. Based on Welsh's arguments and concessions on appeal, we further affirm the trial court's determination that Wardley did not accept an illegal net listing. We therefore affirm the trial court's judgment against Welsh for Wardley's commission. Finally, based on the plain language of the purchase agreement,

---

9. We have reviewed Wardley's attorney fees argument under Utah Code Ann. § 78–27–56.5 (1996) and determine it is without merit; we

consequently decline to address it. *See State v. Carter*, 776 P.2d 886, 888–89 (Utah 1989).

we conclude Wardley is not entitled to attorney fees in this action. Accordingly, we affirm.

GREENWOOD and ORME, JJ., concur.