Judge STONE,
dissenting:
132 I respectfully dissent. Drawing all reasonable inferences from the factual record in favor of Mr. Mallory, as is required under a rule 12(b)(1) analysis, the facts in this case are not sufficient to conclude that the BYU defendants qualify as "employees" under the Utah's Governmental Immunity Act (Act)).[1] To the contrary, the evidence developed below supports an inference that BYU's relationship with Provo City was one of independent contractor, thus excluding BYU from the statutory definition of employee.
*933 ANALYSIS
I. THE PROPER ANALYSIS BEGINS WITH THE ACTS EXCLUSION OF INDEPENDENT CONTRACTORS FROM THE DEFINITION OF "EMPLOYEE"
183 First, I agree with Part I of the Court's opinion that the Utah Court of Appeals erred in interpreting the Act. The issue is simply whether the BYU defendants were servants or independent contractors. Independent contractors are expressly excluded from the definition of "employee" under the Act; "servants" are included. Therefore, in examining whether the court of appeals erred in reversing the trial court's granting of the BYU defendants' motion to dismiss, the proper inquiry should be whether the BYU defendants qualify as independent contractors.
34 The factors relevant to an assessment of independent contractor status and the right-to-control concept have been applied "most frequently when deciding whether a worker was an employee or an independent contractor for the purpose of determining whether the Workers' Compensation Act controlled the remedies available to an injured party." (Glover ex rel. Dyson v. Boy Scouts of Am., 923 P.2d 1383, 1385 (Utah 1996). However, the common law right-to-control standard is derived from agency law, "the purpose of which is to define the limits of a master's vicarious liability for a servant's tortious conduct." Id. (citing Bennett v. Indus. Comm'n, 726 P.2d 427, 430 n. 2 (Utah 1986); Restatement (SEconp) or AcEncy § 220 (1958) (outlining elements of right-to-control test)).
T 35 This court has identified several main facts which are helpful in determining whether an employer had the right to control an alleged employee, Averett v. Grange, 909 P.2d 246, 249 (Utah 1995). These factors include (@) "whatever covenants or agreements exist concerning the right of direction and control over the employee"; (ii) "the right to hire and fire"; (iii) "the method of payment" (Le., wages versus payment for a completed job or project); and (iv) "the furnishing of equipment." Id. (internal quotation marks omitted).
1 36 Importantly, it is the right to control the physical manner in which the work is performed that is determinative. In Dowseft v. Dowsett, this Court emphasized that
"(aln agent who is not subject to control as to the manner in which he performs the acts that constitute the execution of his agency is in a similar relation to the principal as to such conduct as one who agrees only to accomplish mere physical results. For the purpose of determining liability, they are both 'independent contractors' and do not cause the person for whom the enterprise is undertaken to be responsible...."
116 Utah 12, 207 P.2d 809, 811 (1949) (emphasis omitted) (quoting RastaTEMENT (First) or Acznoy § 220 emt. c (1933)). This is the key distinction between the agent who is a servant and the agent who is an independent contractor. As the Restatement indicates:
(1) A master is a principal who employs an agent to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service.
(2) A servant is an agent employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master.
(8) An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking. He may or may not be an agent.
REstatEmEnNt (SEconp) or AcEncy § 2 (1958).
137 Not surprisingly, in the context of respondeat superior liability, this court has applied a similar right-to-control test. See Foster v. Steed, 19 Utah 2d 435, 432 P.2d 60, 63 (1967). The Foster case dealt with the relationship between a franchisor oil company, Texaco, and its franchisee, an operator of a service station. The court held that *934 "[InjJone of the evidence cited by plaintiff indicates that Texaco retained control of the [franchisee's] day-to-day operation but, rather, merely influenced the result to be achieved, revealing an independent contractor status." Id.
II. AFTER APPLYING THE RIGHT-TO-CONTROL TEST TO THE PROF-ERRED EVIDENCE, THERE IS A REASONABLE INFERENCE THAT BYU IS AN INDEPENDENT CONTRACTOR
A. BYU's Relationship with Provo City Is: not Clearly Defined in the Record, but Stems from a Nonbinding Ordinance
4 38 " '[Aln agency is created and authority is actually conferred very much as a contract is made':a meeting of the minds must exist between the parties." Wardley Corp. v. Welsh, 962 P.2d 86, 89 (Utah Ct.App.1998) (quoting 3 AmJurZ2Dp Agency § 17 (1986)). Therefore, the first inquiry is into the fundamental nature of the relationship between BYU and Provo City.
{39 In undertaking a similar analysis, the majority suggests that the relationship between Provo City and the BYU defendants stems from the Provo City ordinance, which provides that "a person who is employed by a college or university and is not a peace officer may direct traffic on public streets while under the supervision of a peace officer employed by the same college or university." Provo, UTax, CIty CopE § 9.10.060(@2). As the majority observes, this ordinance is limited to cireumstances of "public emergency or to aid in the orderly movement of traffic related to public gatherings in excess of 5,000 people." Id. § 9.10.060(8).
¶ 40 The majority errs when it concludes, based on this ordinance, that "[the relationship between Provo City and the BYU Defendants, acting pursuant to the Provo City ordinance, exhibits the hallmarks of a master-servant relationship." Supra 124. The Provo City ordinance is permissive and does not bind anyone to act; it has no effect unless BYU agrees to provide traffic control, hire cadets, and supervise them. While the Provo City ordinance would have facilitated this agreement, there is nothing in the record regarding the operative terms of this agreement or even whether it was oral or written. Thus, there exists a gap in the evidence regarding the pivotal issues of the creation and existence of BYU's relationship with Provo City vis-a-vis the provision of traffic control. The majority does not address this gap in evidence, but instead too narrowly focuses on the ordinance alone as defining these parties' relationship when it is merely one aspect of the relationship. As a corollary, Ms. Robinson's actions as traffic cadet stem from and are influenced by the relationship between BYU and Provo City, but her actual authority is derived from her employment by BYU, the terms of which are not in the record. Because the ordinance expressly requires that she be an employee of BYU, she cannot have greater status, visa-vis Provo, than BYU. Cf. Luker Sand & Gravel Co. v. Indus. Comm'n, 82 Utah 188, 23 P.2d 225, 227 (1933) ("In no event could Osment's relationship to the Sand & Gravel Company be more intimate than that of Hobbs himself.").
1 41 The majority posits that "most importantly ... because the BYU Defendants derive their authority to direct traffic exclusive, ty from the Provo City ordinance, Provo's city council could, at any time, rescind the ordinance or amend it to provide for additional control and direction over BYU and its agents." Supra 127 (emphasis added). Respectfully, this observation is based on the flawed premises that the ordinance, rather than an actual agreement, is the exclusive source of authority and, secondarily, that a governmental entity retains the right to control simply through the power to legislate. An agent of the government is always subject to a potential right to control by future legislation. The fact that Provo City could re-seind or amend the ordinance in the future to create a level of control that did not previously exist cannot provide the foundation for finding a master-servant relationship. Such an approach would render the Act's clear exception of independent contractors from the term "employee" meaningless.
42 The government's potential power to regulate is really no different in this regard *935 than the retained authority of a private person using an independent contractor. A homeowner might require a plumber to perform "in a workmanlike manner" but that is hardly the retention of a right to control. See Dowsett v. Dowsett, 116 Utah 12, 207 P.2d 809, 811 (1949) (recognizing that a non-servant may operate under an agreement "to use care and skill in accomplishing results"). A homeowner might go further and specify a particular faucet to be installed by a plumber, but that would not amount to sufficient control to vitiate the independent nature of the plumber. The homeowner could, hypothetically, by virtue of his right to control who may enter his or her home, insist on supervising every aspect of the plumbing job, down to work hours, uniforms, the snugness of the joints and the sealant used. This might transform the contract between the homeowner and the plumber into an employer-employee relationship. But the fact that a homeowner has the legal ability to structure the relationship in that manner does not mean that all homeowners who hire plumbers are employers,. A party's mere legal ability to insist on a different agency, whether it derives from legislative power or otherwise, does not constitute a right to physically control the agency that actually existed.
1 48 All agents are subject to control. It is control over the physical manner of carrying out the work that determines servant or independent contractor status. Here, the record supports only a general restriction on BYU's ability to direct traffic on city streets at its large events: if BYU chooses to use cadets, they must be BYU employees and they must be supervised by POST-certified BYU police. That is hardly control by Provo over the physical conduct of the BYU police or its cadets.[2]
1 44 A city might contract with an independent contractor to paint a courthouse, build a jail, or repair a highway. The fact that such contracts might have limitations specifying what the job is-which courthouse and which color, detailed architectural plans for the jail, or traffic safety requirements for the highway repair-does not imply a retained right to control that transforms the relationship from an independent contract. Similarly, if a city were to contract with a private firm to provide snow plowing, but only when it snows, the fact that snowstorms might occur intermittently does not equate to a "right to control" when the plowing occurs. Here, absent more evidence, it can be inferred that Provo has simply determined to allow BYU or its private police foree the authority to control traffic at large university events.
145 Finally, even if we were to consider only the ordinance itself, its terms do not support a conclusion that Provo City had the right to control the physical conduct of the traffic cadet's duties. Instead, the ordinance at issue is an express delegation to BYU and its private police force of the rights to hire and supervise cadets. This is the opposite of Provo reserving the right to control: instead of supervising the physical conduct of the traffic cadet's duties, Provo allowed a private party to do so. This loose, standardless delegation would not be enough to render Provo City liable based on BYU's performance of the task, and therefore should not be enough to result in immunity.
146 The court should have examined the actual ageney relationship as it existed at the time of the accident for purposes of liability and immunity. The question here is, having authorized agent (BYU and its cadets) to perform a task, what control did Provo actually reserve? What was the actual arrangement that existed at the time of the accident? Applying the established test for finding an independent contractor, and at this stage indulging all inferences in favor of the non-moving party, the court should ask: (1) what covenants, express or implied, exist concerning the right to control the physical manner in which the work is carried out? (2) which party had the right to hire and fire? (8) what was the method of payment? and, (4) who *936 supplied tools and equipment? Harry L. Young & Sons, Inc. v. Ashton, 538 P.2d 316, 318 (Utah 1975).
B. The Facts Support an Inference that the BYU Defendants Were Independent Contractors
147 As to the first question, the parties agreed that, if cadets were used, they would be employed by BYU and supervised by BYU police.[3] It does not matter that cadets perform a governmental function; the Act assumes that there will be governmental functions delegated [4] to independent contractors, and does not extend immunity to them.
148 The ordinance limits traffic cadets' authority to direct traffic to certain defined cireumstances and conditions. That is consistent with an independent contractor relationship, which is typically limited to a "particular project or piece of work." Young & Sons, 538 P.2d at 318.
4 49 The record indicates that Provo City had no involvement in Ms. Robinson's supervision. Ms. Robinson was on the radio with her supervising BYU police officer and not a Provo City police officer. Provo City did not dictate how many hours cadets worked or determine where they would be stationed. Indeed, the Provo City police chief's affidavit merely states that he had "witnessed" cadets in action and was "satisfied" with their "professional manner." There is nothing in the affidavit to suggest that the chief or other Provo City police officers, acting in their official capacities, reviewed the cadets' performance or provided input regarding the manner or method in which they performed their duties. The same can be said with respect to the training provided to cadets. As acknowledged at oral argument and as confirmed by the chiefs affidavit, the chief simply "reviewed" the training carried out by BYU and was "satisfied" with that training.
T 50 Next, Provo City did not participate in BYU's hiring or firing decisions regarding cadets. The Provo City ordinance in this case contemplates that the individuals directing traffic, under the circumstances discussed above, would be employed by "a college or university," thus implying that BYU and not Provo City would retain the right to hire and fire these individuals. In fact, the record implies that BYU was solely responsible for reviewing the cadets' skills and qualifications as part of the selection process, engaging the cadets, and compensating the cadets.
¶ 51 Notably, the majority concludes that Provo City "retained the right to discharge the BYU Defendants ... at any time" and cites Provo City Code section 9.01.050(1) as support for this proposition. Supra 26. However, the cited ordinance grants the Provo chief of police power to suspend only with respect to officers and agents "in the Police Department" and does not extend to the BYU police or its cadets.[5] The police chief's affidavit conveys that the two police departments, Provo City and BYU, coordinate on a regular basis and that he considers the BYU police officers to be "colleagues" rather than subordinates. The fact that BYU had the sole right to hire and fire, as well as to direct *937 and supervise the cadets, favors a finding that the cadets were employed by BYU in carrying out independent contractor duties. See Ludlow v. Indus. Comm'n, 65 Utah 168, 235 P. 884, 888 (1925) ("[Aln independent contractor can employ others to do the work and accomplish the contemplated result without the consent of the contractee, while an employé cannot substitute another in his place without the consent of his employer.").
¶ 52 In addition to the lack of supervision and hiring/firing authority, Provo City also had nothing to do with the compensation provided to either the cadets or the BYU police. The payment of compensation is a key factor commonly used to distinguish between independent contractor and employees in a variety of contexts. See Young & Sons, 588 P.2d at 818 (listing as a factor to consider "the method of payment, ie., whether in wages or fees, as compared to payment for a complete job or project").
1 53 Specifically, BYU receives no compensation from Provo for traffic direction. By using its own employees and cadets, BYU assumes the risks and reaps the benefits of having control over staffing those positions. That is a hallmark of an independent contractor rather than an employee. Likewise, the basic indicia of an employment relationship between Provo City and the cadets are missing. Provo City did not provide Ms. Robinson any wages, benefits, or insurance or withhold any taxes from her compensation. While not dispositive, the manner in which the parties structured their relationship is at least probative of Ms. Robinson's status as a servant or independent contractor.
{54 The final factor weighing in favor of an inference that the BYU defendants were independent contractors is that Provo City did not provide any equipment necessary for the cadets or the BYU police to perform its traffic control activities, Consistent with the other factors, all favoring an independent contractor status, the record reveals that BYU retained the right to determine appropriate equipment.
155 To conclude, Provo City passed an ordinance that authorizes university cadets, employed by a university and supervised by university police, to direct traffic in certain specified situations. Based upon the record below, there is nothing to indicate that Provo City reserved any authority over those cadets, either in terms of supervision, hiring, firing training, disciplining, dispatching, or assisting. BYU, pursuant to the Provo City ordinance, employed Ms. Robinson, among others, as student cadets to assist BYU's own police foree in traffic control and direction activities on Provo City streets. On this record, we must infer that BYU selected Ms. Robinson, directed her in the timing and placement of her traffic direction, provided her with any necessary traffic control equipment, and otherwise supervised every aspect of her duties. Nothing in the record suggests that Provo had any say in how many cadets (if any) were assigned to work that day, where they were stationed, how many were supervised by how many university police officers, how long before the game they appeared, how long after they stayed, how they dressed, or whether they were equipped with flags, flares, whistles, vests, or signs. Under these circumstances, there is at least an inference that the BYU defendants were acting as independent contractors without active participation by Provo City. Based on that inference, the motion to dismiss should have been denied. I would affirm the Utah Court of Appeals.

. As a procedural matter, a motion to dismiss brought under rule 12(b)(1) of the Utah Rules of Civil Procedure is governed by the same standard of review as a rule 12(b)(6) motion. Specifically, factual allegations are accepted as true and all reasonable inferences to be drawn from those facts are considered in a light most favorable to the plaintiff. See Gregory v. Shurtleff, 2013 UT 18, ¶ 8, 299 P.3d 1098; Peterson v. Delta Air Lines, Inc., 2002 UT App 56, ¶ 2, 42 P.3d 1253.

. State statute places fairly extensive restrictions on private security guards, considerably more than the restrictions placed on BYU in using traffic cadets. See Urax Cope §§ 58-63-101 to - 503. Under the court's reasoning, should a private guard end up performing a governmental function such as directing traffic at a private event, they are immune. Likewise, are private highway contractors' flagpersons, who presumably also operate under at least some state regulation or safety laws, similarly immune from civil action?

. The Court's opinion necessarily implies that the BYU police, when supervising cadets, are also Provo employees. They are, after all, acting for Provo and subject to the same "control" as the cadets. Is Provo liable for workers compensation claims for these officers? Tax withholding? Overtime violations? Why would the tests be any different?

. While Provo may have a nondelegable duty here to maintain safe streets, that is irrelevant for purposes of analyzing who is an "employee" under the act. The Act makes no distinction between delegable and nondelegable functions. Plainly, state actors engage independent contractors to perform nondelegable duties all the time. Every state highway project potentially involves such contracts.

. The Provo Code establishes a Provo Police Department, Provo, Urag, Cope § 9.01.010, and the provisions giving the Provo chief control do not even permit him to fire subordinate officers-only suspend them for up to fifteen days. Id. § 9.01.050(1). By its terms, this does not apply to BYU police or BYU cadets. Importantly, the Provo chief also has the ability to appoint special patrolmen to serve without pay and expressly requires the Chief to supervise such patrolmen. Id. § 9.01.070. It is revealing that Provo evidently had the ability to appoint its own volunteer patrolmen, and retain supervision of them, but did not do so with respect to traffic control at BYU events. Instead, it authorized BYU to employ cadets, and required that BYU supervise them.