2010 UT App 237

**Jennifer OTTENS, Plaintiff
and Appellant,**

v.

**Dan McNEIL and Nickolas Coleman,
Defendant and Appellee.**

**No. 20090231–CA.**

Court of Appeals of Utah.

Aug. 26, 2010.

Loren M. Lambert, Midvale, for Appellant.

Richard K. Glauser and Michael W. Wright, Sandy, for Appellee.

Before Judges DAVIS, McHUGH, and VOROS.

## OPINION

McHUGH, Associate Presiding Judge:

¶ 1 Plaintiff Jennifer Ottens appeals from various procedural and evidentiary rulings and from the trial court's entry of a directed verdict in favor of Defendant Dan McNeil (Dan). We reverse and remand in part, and affirm in part.

## BACKGROUND [1]

¶ 2 Ottens's lawsuit stems from injuries she sustained in a March 29, 2002 automobile accident. The accident occurred on Interstate Highway 15 (I–15) when Ottens's car was rear-ended after she stopped suddenly to avoid hitting a kitchen chair owned by Dan. The chair was part of the contents of a pickup truck used to move property from Dan's former home in Bluffdale (the Bluffdale home) to his new residence in the Fort Union area (the Fort Union home).

### The Move

¶ 3 At the time of the accident, Dan and his former wife were co-owners of D & K Finish Carpentry (D & K). Although Dan had relocated when he and his wife divorced in 1998, they continued to operate D & K from the Bluffdale home. D & K's office furniture and equipment, as well as some of Dan's personal belongings, including the chair and the kitchen set to which it belonged, were located at the Bluffdale home. "[B]ecause of the divorce," and as part of "the last deal" between Dan and his former wife, they were selling the Bluffdale home, which required Dan to remove all of the property.

¶ 4 Assisting Dan with the move were his son, Jacob McNeil (Jake), Dan's daughter, and some unidentified D & K employees. At his deposition,[2] Dan testified that he may have given Jake some money for gas to help with the move, but later clarified that Dan was reimbursed by D & K. Although Dan was not certain at his deposition as to whether Jake was on the D & K payroll during the move, he testified at trial that Jake and the other laborers were working for D & K and were "on the clock" during the move. Jake testified at his deposition that he was paid for his time helping with the move in the form of a check from D & K payroll, but in response to a question from Ottens's counsel, Jake did not include that date among the time periods in his life during which he "estimate[d]" that he was "probably" working for D & K.

¶ 5 On moving day, Dan was "in and out" of the house, "directing the move," helping to box things up, telling people which items needed to be moved out, and "[t]aking stuff back and forth to the trucks." Neither Jake nor Dan could recall who actually loaded the kitchen chairs, or if the chairs were loaded into Jake's blue-green 1996 Ford pickup truck (the green truck) or the other truck being used to transport Dan's belongings.[3] When the trucks were "full," Dan and Jake secured the load by "throwing ropes back and forth," weaving the ropes in and out of the furniture, and "hooking [the ropes] in the eye hooks" on the trucks.

### The Accident

¶ 6 Dan and Jake each drove one of the pickup trucks from the Bluffdale home to the

---

1. "In reviewing the district court's grant of a directed verdict, we review the facts in the light most favorable to the losing party." *Garrard v. Gateway Fin. Servs.*, 2009 UT 22, ¶ 2, 207 P.3d 1227. Because we are reviewing the correctness of the trial court's directed verdict issued after trial, we recite those facts in detail.

2. The full transcripts of Jake's and Dan's depositions were not provided to the jury. For purposes of our review of the directed verdict, we consider only the portions of those depositions that were read into the trial record.

3. Apparently, the other truck belonged to Dan, but there is no description of that truck in the record.

Fort Union home, with Dan leaving between fifteen and thirty minutes after Jake. Neither Jake nor Dan saw anything falling from his vehicle in transit, but Dan acknowledges that one of his chairs "fell from the truck owned and driven by Jake McNeil."

¶ 7 Ottens testified that she was traveling northbound in the center lane of I–15 when a "green truck" that was traveling in the right-hand lane "moved over into [the center] lane." "A second or two" later, the "chair blew out of the back" of the truck and landed in the center lane. Ottens "immediately hit [her] brake" to avoid the chair, and after she came to a full stop, another car struck her from behind, injuring Ottens in the process.

¶ 8 Dan testified that as he was driving to the Fort Union home, he "recognized one of [his] black chairs on the side of the road" and called Jake, who confirmed that a chair was missing. Although Dan could not recall what he did next, he acknowledged that the accident report contained handwriting that appeared to be his. He also acknowledged that those portions of the report identified Dan as the driver and D & K as the "Registered Owner," and listed Dan's age, date of birth, years of driving experience, and telephone number. Another part of the report, which was in handwriting unfamiliar to Dan, listed the address of the Bluffdale home as the driver's address. Dan had no memory of writing the report and did not believe he had done so. Dan testified that he "definitely did not fill out that [he] was the driver of the vehicle" and that he first learned he was listed as the driver a few days after the accident when he received a copy of the report.

¶ 9 Jake testified that after he arrived at the Fort Union home, Dan used his cell phone to call and request that Jake "count how many chairs were in the kitchen set." According to Jake, Dan had been contacted

because "one of his chairs was [believed to be] involved with an accident." In his earlier deposition testimony, Jake related that Dan thought "one of the chairs fell out on the freeway so [Dan was] going to go back and talk to the police officers." In connection with the accident, Dan was issued a traffic citation, which he paid without challenge.

*Procedural History*

¶ 10 Within two months of the accident, Ottens retained legal counsel. Thereafter, Ottens negotiated settlements with some of the other parties involved, but did not file a complaint against Dan until June 22, 2005, over three years after the accident and nine months before the expiration of the statute of limitations, *see* Utah Code Ann. § 78B–2–307 (2009) ("An action may be brought within four years: ... (3) for relief not otherwise provided for by law.").[4] Relying on the information in the accident report and the traffic citation, Ottens alleged that the chair fell out of a truck driven by Dan and that Dan's "failure to properly secure his load ... seriously injured" Ottens and damaged her vehicle.

¶ 11 Shortly thereafter, Ottens attempted to serve Dan with the summons and complaint at the Bluffdale home, which was the address listed on the accident report. Because Dan had moved, the attempt was unsuccessful. Ottens then obtained two alternate addresses for Dan from the Utah Department of Public Safety but was unable to locate him at either location.[5] Ottens next inquired whether Dan's insurance provider would accept service on Dan's behalf. After some indecision, the attorney provided by the insurance company, who subsequently represented Dan, accepted service of the summons and complaint for Dan on March 13, 2006.[6]

4. The statutory provisions in effect at the time of the accident have since been renumbered, but the language remains unchanged. Therefore, as a convenience to the reader, we cite to the current version of the Utah Code.

5. Ottens also found an address for a Dan McNeil in Moab, but learned upon attempting service that the resident was a different individual with the same name.

6. After initially refusing to accept service, the insurance provider agreed to do so. It then retracted that consent, due to concern that Dan might be prejudiced if his default were entered, unless Ottens agreed to limit her recovery "to the available insurance policy limits." Because Ottens refused to do so, the insurer did not accept service until it located Dan.

¶ 12 Dan filed his answer on March 27, 2006—two days before the statute of limitations on Ottens's claims expired and before the answer was due.[7] Dan denied that he was the driver, stating that Jake "may have been operating the [green truck] at the time of the accident and . . . may have been responsible for loading the vehicle." Dan further "reserve[d] the right to amend [his answer] should he discover that a person other than . . . Jake . . . was operating the [green] truck."

¶ 13 Based on Dan's statement, Ottens decided to take Dan's and Jake's depositions, and to conduct other discovery designed to identify the driver of the green truck. Ottens made no attempt to amend the complaint at that time to modify the allegations, claims, or parties before the statute of limitations expired. On August 10, 2006, over four months after Dan filed his answer, Ottens took Jake's and Dan's depositions,[8] during which they each testified that Jake drove the green truck. Jake also indicated that the day of the move was a normal work day and that he was compensated for the hours he spent transporting the property with his regular company paycheck. Although Dan's memory had faded between the time of the accident and his deposition taken over four years later, he indicated that he would trust Jake's recollection of how Jake was paid.

¶ 14 In response to that information, on September 5, 2006, Ottens filed a motion to amend her complaint, seeking to add Jake as a party.[9] She also sought leave to modify the factual allegations to contend that Jake was driving the green truck, that Dan personally hired Jake to help with the move, and that both Dan and Jake "fail[ed] to properly secure the load." Ottens argued that the amended complaint related back to the original complaint and that the equitable discovery rule served to toll the statute of limitations. Dan opposed the motions, arguing

that neither theory was applicable. Dan's opposition memorandum, filed on September 20, 2006, states, "Defendant disputes that he paid or employed Jake McNeil to assist him in transporting the property. He acknowledges that Jake testified that he was paid for the move, testimony that he disputes. But, *Jake testified that he was paid by D & K Finish Carpentry, Inc., and not Mr. McNeil, personally.*" (Emphasis added.)

¶ 15 The trial court denied Ottens's motion to add Jake as a defendant, concluding that doing so would be "legally futile" because the motion was barred by the four-year statute of limitations. The trial court further held that the proposed amendment did "not relate back to the time of the filing of the original complaint because there is no identity of legal interest between Jake . . . and . . . Dan," and that Ottens knew of Jake's involvement before the limitations period expired but waited another six months to file the motion to amend the complaint.[10] However, the trial court did permit Ottens to amend her complaint to allege that Dan had hired Jake to help with the move, that both Dan and Jake participated in loading the green truck, and that they both "failed to properly secure the chair." After these rulings, the case was assigned to a different trial judge. Ottens filed a memorandum with the second trial judge claiming that the first trial judge "ha[d] never ruled directly on the[ ] [equitable discovery rule] issue[ ]." We find nothing in the record to suggest that any action was taken on that memorandum.

¶ 16 In preparation for trial, both Ottens and Dan filed motions in limine. Dan sought to exclude the traffic citation, and Ottens sought to exclude any evidence "regarding when [Ottens] hired counsel." The trial court granted Dan's motion, concluding that the traffic citation was not relevant, but it denied Ottens's motion.

---

7. "A defendant shall serve an answer within twenty days after the service of the summons and complaint is complete within the state and within thirty days after service of the summons and complaint is complete outside the state." Utah R. Civ. P. 12(a). Dan filed his answer fourteen days after Ottens completed service.

8. Earlier, Ottens had unsuccessfully tried to schedule Jake's deposition using an inaccurate address provided by Dan.

9. At that time, Ottens made no effort to name D & K as a party.

10. The trial court's order does not address Ottens's equitable tolling argument.

¶ 17 At trial, both Dan and Jake claimed that D & K, rather than Dan, hired Jake to assist with the move. During Dan's trial testimony, Ottens first moved to add D & K as a party or to strike Dan's "corporate shield defense." Ottens argued that Dan had not previously asserted, in either his pleadings or his deposition, that D & K hired Jake. The trial court denied the motion, concluding that adding D & K would be prejudicial, untimely, and a violation of the due process clause of the Utah Constitution, *see* Utah Const. art. I, § 7.

¶ 18 The trial court then directed a verdict in favor of Dan, concluding that Dan was not vicariously liable for Jake's negligence because there was "no evidence upon which any reasonable juror could conclude that Jake ... was acting as an employee of or in the course and scope of employment with Dan." The trial court further held that there was "no credible evidence upon which a jury could conclude that Dan ... breached a duty owed to [Ottens] to secure the load in the truck."

## ISSUES AND STANDARDS OF REVIEW

¶ 19 On appeal, Ottens first claims that the trial court improperly directed the verdict in favor of Dan. "We review a trial court's grant of directed verdict for correctness" and "will sustain a directed verdict if after examining all evidence in a light most favorable to the non-moving party, there is no competent evidence that would support a verdict in the non-moving party's favor." *Ferguson v. Williams & Hunt, Inc.*, 2009 UT 49, ¶ 19, 221 P.3d 205 (internal quotation marks omitted). " 'Where there is any evidence that raises a question of material fact, no matter how improbable the evidence may appear, judgment as a matter of law is improper.' " *Young v. Fire Ins. Exch.*, 2008 UT App 114, ¶ 20, 182 P.3d 911 (quoting *Kleinert v. Kimball Elevator Co.*, 905 P.2d 297, 299 (Utah Ct.App.1995)).

¶ 20 Ottens next claims that the trial court erred in concluding that her new claims were barred by the statute of limitations and in denying her motions to amend the complaint to add Jake and D & K as parties. Typically, "[t]he standard of review of a denial to amend pleadings is abuse of discretion." *Sulzen v. Williams*, 1999 UT App 76, ¶ 12, 977 P.2d 497 (internal quotation marks omitted). However, when the trial court's denial is based on its conclusion that the amendment would be futile because the statute of limitations bars the claim, the standard is different. *See Gary Porter Constr. v. Fox Constr., Inc.*, 2004 UT App 354, ¶ 30, 101 P.3d 371. The application of the statute of limitations is a question of law, which we review for correctness. *See id.* ¶ 31. To the extent that the statute of limitations analysis involves "subsidiary factual determination[s]," we review those factual determinations using "a clearly erroneous standard." *See Spears v. Warr*, 2002 UT 24, ¶ 32, 44 P.3d 742, *overruled on other grounds by Tangren Family Trust v. Tangren*, 2008 UT 20, ¶ 16, 182 P.3d 326.

¶ 21 Finally, Ottens claims that the trial court abused its discretion in excluding the traffic citation and in admitting evidence regarding when she hired an attorney. "[W]e grant a trial court broad discretion to admit or exclude evidence and will disturb its ruling only for abuse of discretion," reversing only where "the ruling was beyond the limits of reasonability." *Daines v. Vincent*, 2008 UT 51, ¶ 21, 190 P.3d 1269 (internal quotation marks omitted).

## ANALYSIS

### I. The Directed Verdict

¶ 22 Ottens contends that there was evidence from which a reasonable jury could find that Dan was either directly or vicariously liable for her injuries. In response, Dan asserts that the trial court correctly concluded that Dan did not owe a duty to Ottens and that there was no evidence that Dan either hired Jake or participated in the loading and securing of the chair. Reviewing the evidence in favor of Ottens, *see Garrard v. Gateway Fin. Servs., Inc.*, 2009 UT 22, ¶ 2, 207 P.3d 1227 (holding that appellate review of a directed verdict must be undertaken by viewing the facts "in the light most favorable to the losing party"), we first consider the direct claims against Dan and then address the claims based on vicarious liability.

A. The Trial Court Improperly Entered a Directed Verdict on the Direct Liability Claim Against Dan for Negligently Securing the Load.

¶ 23 We begin our analysis with Ottens's claim that Dan was directly liable for negligently loading and securing the chair in the pickup truck. To prove a claim of negligence, a plaintiff must prove "(1) that the defendant owed the plaintiff a duty, (2) that the defendant breached that duty, (3) that the breach of duty was the proximate cause of the plaintiff's injury, and (4) that the plaintiff in fact suffered damages or injuries." *Webb v. University of Utah,* 2005 UT 80, ¶ 9, 125 P.3d 906 (internal quotation marks omitted). " 'The issue of whether a duty exists is entirely a question of law to be determined by the court,' which determination we review for correctness." *Lopez v. United Auto. Ins. Co.,* 2009 UT App 389, ¶ 8, 222 P.3d 1192 (quoting *Ferree v. State,* 784 P.2d 149, 151 (Utah 1989)).

1. One Who Undertakes to Secure a Load Has a Direct Duty Not to Do So Negligently.

¶ 24 Dan asserts that he did not have a duty to secure the load properly and thus cannot be liable for negligence. In support of that position, Dan cites to subsection (6) of Utah Code section 72–7–409 (the Utah Statute), *see* Utah Code Ann. § 72–7–409(6) (2009) (prohibiting drivers from operating improperly loaded vehicles on Utah roadways), and *Ganno v. Lanoga Corp.,* 119 Wash.App. 310, 80 P.3d 180 (2004), for the proposition that only "the operator of the [improperly loaded] vehicle ... has the duty to ensure that [the] load ... is properly confined and tied down." Although the trial court agreed that "if [Dan] undertakes the duty, then he has to do it without negligence," it granted a directed verdict because "there [was] no credible evidence upon which a jury could conclude that Dan ... breached a duty owed to [Ottens] to secure the load in the truck." The trial court also concluded that the Utah Statute did not impose a duty on persons other than the operator of the vehicle. We first consider the effect of the Utah Statute on any duty owed by Dan to Ottens.

¶ 25 In interpreting a statute we look first to its plain language. *See Lopez,* 2009 UT App 389, ¶ 13, 222 P.3d 1192. The relevant statutory language here provides that "[a] vehicle may not be operated or moved on any highway unless the vehicle is constructed or loaded to prevent its contents from dropping ... or otherwise escaping," Utah Code Ann. § 72–7–409(2), and "[a] person may not operate a vehicle with a load on any highway unless the load ... is fastened, secured, and confined to prevent the ... load from becoming loose, detached, or in any manner a hazard to the safe operation of the vehicle, or to other highway users," *id.* § 72–7–409(6). We agree with the trial court that the express terms of the Utah Statute impose an obligation only on the operator not to drive a vehicle on a Utah highway unless any load is secure, *see id.* § 72–7–409(2), (6). However, contrary to Dan's interpretation, we see nothing in the Utah Statute that purports to insulate other persons who participate in securing a load from liability for the injuries caused when a negligently secured load falls from a vehicle.

¶ 26 Dan argues that such protection can be implied from the Utah Statute. In support, Dan relies on *Ganno,* a decision from the Washington Court of Appeals. However, the question before the *Ganno* court was not whether a statute similar to the Utah Statute insulated a negligent nondriver from liability for injuries caused by the improperly secured load. Rather, it was whether the plaintiff-driver's "failure to comply with [the Washington statute] ... was ... evidence of his own negligence." *Ganno,* 80 P.3d at 184. The Washington Court of Appeals concluded that the Washington statute imposed a duty on the driver to secure the load properly, which the plaintiff-driver had breached. *See id.* There is nothing in the *Ganno* decision suggesting that a party who helped secure the load, but did not drive the vehicle, cannot also be sued for negligence. To the contrary, the *Ganno* court held that the nondriver, a lumberyard, owed no duty to the plaintiff because it did not undertake to secure the load and instead warned by sign that it was

its "policy not to secure loads for customers." *See id.* at 181–83. We see nothing in the Washington decision that would support an interpretation of either the Utah Statute or its Washington counterpart as a shield against negligence claims for injuries caused by a nondriver's active participation in negligently securing a highway load.

¶ 27 Furthermore, we agree with Ottens that our own jurisprudence supports her argument that if Dan undertook the task of securing the load he had a duty not to do so negligently. In *Magana v. Dave Roth Construction*, 2009 UT 45, 215 P.3d 143, the plaintiff was off-loading trusses at a construction site when they came loose, fell on him, and caused serious injury. *See id.* ¶ 1. The plaintiff brought suit against both the general contractor and the subcontractor that operated the rigging from which the trusses fell. *See id.* ¶ 2. The plaintiff claimed that because the general contractor's superintendent assisted the subcontractor in loading the trusses, the general contractor was liable for both the superintendent's negligence and the subcontractor's negligence. *See id.* The supreme court rejected the plaintiff's first theory that the general contractor was liable for the subcontractor's negligence under the "retained control doctrine." *See id.* ¶ 35. Nevertheless, it allowed the plaintiff to pursue a direct negligence claim against the general contractor because there was evidence to support a finding that its superintendent assisted with loading the trusses. *See id.* ¶ 39. The *Magana* court held that an "employer may be liable for its own direct negligence" where the employer participates in negligently loading materials, thereby "directly act[ing] in such a way that causes an injury." *Id.* ¶ 38. Consequently, the supreme court remanded the case to the trial court for a determination of whether the superintendent, in fact, had assisted. *See id.* ¶ 39. As in *Magana*, if

Dan participated in securing the load, he owed highway users, like Ottens, a duty not to do so negligently.

2. The Undisputed Evidence Established that Dan Helped Secure the Fully Loaded Pickup Trucks.

¶ 28 Thus, the next question regarding Dan's direct liability is whether any competent evidence showed that Dan helped secure the load. Viewing "the facts in the light most favorable to [Ottens]," *see Garrard v. Gateway Fin. Servs., Inc.*, 2009 UT 22, ¶ 2, 207 P.3d 1227, we conclude that there was evidence presented from which the jury could have found that Dan participated in securing the load, *see Magana*, 2009 UT 45, ¶ 39, 215 P.3d 143. *See generally* 74 Am.Jur.2d Torts § 61 (discussing the general rule that "two or more persons engaged in a common enterprise are jointly liable for the wrongful acts committed in connection with the enterprise").

¶ 29 The testimony at trial indicates that Dan and Jake, working together, secured the fully loaded pickup trucks by "throwing ropes back and forth" to weave the ropes in and out of the furniture before "hooking [the ropes] in the eye hooks." Indeed, Dan states in his brief to this court, "All that Plaintiff was able to show was that Dan had helped tie some ropes to the eye hooks on the pickup." Dan also testified that no tarp was used to secure the load, making the ropes the only method of keeping items from falling from the trucks. Notably, Jake opined at trial that the chair fell out because "[i]t probably got missed when the ropes were getting looped through everything." Indeed, we can find no contrary evidence on this point; Dan never denied Jake's statement that they secured the load together.[11] We agree with Ottens that there was enough evidence presented to establish that Dan helped secure the load.[12]

---

11. In *Magana v. Dave Roth Construction*, 2009 UT 45, 215 P.3d 143, the supreme court remanded to the trial court because there was a factual dispute as to whether the defendant participated in securing the trusses that fell on the plaintiff. *See id.* ¶ 39. In this case, the only evidence is that Jake and Dan secured the loaded trucks together, making remand unnecessary.

12. With respect to the other elements of negligence, the trial court explained, "Not that there wasn't some negligence.... You will definitely go to the jury on the issue of the chair coming off, causation, you're okay on all those issues."

¶ 30 Dan also contends that the trial court properly dismissed Ottens's negligence claim against Dan because there was no evidence that could identify the person who actually loaded the chair into the green truck. We are unconvinced that such evidence was necessary. No matter which individual actually loaded the chair, the evidence established that the only effort to secure it was by weaving rope around the contents of the trucks and then fastening the rope to the eye hooks. There was uncontested testimony that Dan, working with Jake, performed that task. Consequently, Dan had a duty to secure the chair properly and the trial court erred in directing a verdict on Ottens's direct negligence claim against him on the basis that Dan owed Ottens no duty.

**B. The Trial Court Correctly Entered a Directed Verdict on the Claims Against Dan Personally as Jake's Employer.**

¶ 31 In addition to her claim that Dan is liable for his own conduct, Ottens argues that Dan personally employed Jake on the day of the move and is vicariously liable for Jake's negligence. The trial court concluded that there was no competent evidence that Dan, as opposed to D & K, employed Jake. We agree.

**1. The Only Evidence Presented at Trial Established that Jake Was Working for D & K During the Move.**

¶ 32 Dan testified that the move included the D & K office, as well as his remaining personal property, so that the house could be sold as "the last deal" in his divorce.[13] On cross-examination by his own counsel, Dan described in more detail the specific items of property transported, which included office equipment, office furniture, carpentry tools, and personal furniture like his kitchen table and chairs.[14] Jake's trial testimony corroborated Dan's assertion that they moved Dan's "whole office" and "lots of tools."

¶ 33 Ottens's counsel asked Dan whether he had stated during his deposition that Jake was working for D & K during the move. When Dan assumed that he had mentioned it, Ottens's counsel was unable to locate a question and answer from the deposition that could be used to impeach Dan. During cross-examination, Dan's own counsel established that D & K was mentioned several times during Dan's deposition. In particular, Dan verified that his deposition testimony included his statement that he trusted Jake's memory that the day of the move was a normal work day and that the laborers were paid by a regular paycheck.

¶ 34 In response to additional questions from Ottens's counsel, Dan testified that Jake did not work for him in any capacity during the move but was instead working for D & K. Although Ottens's counsel then read portions of Dan's answer to Ottens's amended complaint into the record, that evidence merely reiterated Dan's assertion that he had not hired Jake in any individual capacity.[15] Upon further questioning, Dan stated that "it was a work day [and that i]t was D & K Finish Carpentry [that] was working." Indeed, Dan testified that D & K employed both him and Jake on the day of the move. Dan acknowledged in his deposition testimony that he believed he gave the laborers "some gas money or something," but clarified that anything paid to Jake and the other laborers was paid directly by D & K, or paid by Dan who was then reimbursed by the company.

¶ 35 Jake's trial testimony is unequivocal on this point. He stated that he was employed by D & K, was not working for Dan personally, and was always paid by D & K.[16]

---

**13.** Dan also indicated that during the move he was "packing offices and trying to get ... all of the paperwork stuff packed up in boxes," and that "he had a lot of stuff in the office [he] had to box."

**14.** Dan testified that filing cabinets, a desk, a desk chair, a love seat for office visitors, a computer, a copy machine, a fax machine, a printer, drawing rolls for D & K projects, and tools, including a shaper, a table saw, bowl compres-

sors, and miscellaneous hand tools, were moved, as well as some of his personal items.

**15.** It was during this exchange that Ottens first moved to amend the pleadings to add D & K as a party.

**16.** Jake also testified that Dan was a supervisor for and an employee of D & K.

Jake confirmed that he was paid for the day, including the time it took to move Dan's personal property, with a company paycheck. Jake further noted that his trial testimony was consistent with the information he had provided during his deposition, with the exception that he did not specifically indicate at his deposition that some of the property belonged to D & K.[17] We agree with the trial court that, despite the fact that some of Dan's personal property was included, the evidence was consistent that D & K employed Jake and the other laborers to move the property.

¶ 36 Furthermore, even if it could be inferred that Dan personally gave Jake "twenty bucks or something" to reimburse him for the cost of the gasoline burned during the move, we agree with the trial court that this is not sufficient to create an employment relationship. *See Dowsett v. Dowsett,* 116 Utah 12, 207 P.2d 809, 812–13 (1949) (Wolfe, J., concurring) (cautioning that in situations where one does a favor for another and there is no right to control, it may be inconsistent with public policy to impose the doctrine of respondeat superior);[18] *see also Arriaga v. County of Alameda,* 9 Cal.4th 1055, 40 Cal.Rptr.2d 116, 892 P.2d 150, 155 (1995) (concluding that reimbursement for incidental expenses did not establish an employment relationship); *Giltner, Inc. v. Idaho Dep't of Commerce & Labor,* 145 Idaho 415, 179 P.3d 1071, 1079–81 (2008) (Jones, J., concurring in part, dissenting in part) (asserting that reimbursement of expenses is not determinative of whether an employment relationship exists because the key question is whether the principal had "the right of control" (internal quotation marks omitted)); *Black v. McDonald's of Layton,* 733 P.2d 154, 157–58 (Utah 1987) (concluding that company's "negligible" payment of some expenses did not establish that the activity was employment-related); *Buczynski v. Industrial Comm'n,* 934 P.2d 1169, 1177 n. 4 (Utah Ct.App.1997) (stating that, although reimbursed expenses may indicate the presence of an employment relationship, that factor is not dispositive of the issue). *But see United States v. Porter,* 569 F.Supp.2d 862, 874 (S.D.Iowa 2008) ("[I]f the employer pays for the worker's business expenses, the worker is ordinarily an employee.").

**2. Ottens Did Not Present Evidence to Support a Finding that D & K Was the Alter Ego of Dan.**

¶ 37 Nevertheless, Ottens contends that the real purpose of the move was personal and that Dan should be deemed the actual employer regardless of whether D & K paid Jake. According to Ottens, Dan inappropriately used D & K to fund his personal moving expenses, thereby permitting the jury to ignore the corporate employer and instead find Dan personally liable. Had Ottens presented evidence that could support a finding that D & K was merely the alter ego of Dan, she may have been able to pursue this claim. However, an alter ego theory was not raised during trial, nor did Ottens produce evidence that could support a decision to pierce the corporate veil to reach Dan.

¶ 38 "The corporate form may be disregarded when there is such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist ... and the observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow." *Smith v. Grand Canyon Expeditions Co.,* 2003 UT 57, ¶ 36, 84 P.3d 1154 (omission in original) (internal quotation marks omitted); *see also Brigham Young Univ. v. Tremco Consultants, Inc.,* 2005 UT 19, ¶ 38, 110 P.3d 678 (holding that judgment against one corporation could not be collected against a second corporation where the plaintiff did not raise an alter ego theory). We recently set forth the factors courts have considered significant in establishing the unity of interest required to prevail on an alter ego theory as

---

17. Without the full transcripts of the depositions, we cannot determine whether Ottens asked additional questions designed to elicit information about D & K's reasons for employing Jake during the move.

18. Jake testified that Dan did not exercise any control over how he drove the green truck.

(1) undercapitalization of a one-man corporation; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) siphoning of corporate funds by the dominant stockholder; (5) nonfunctioning of other officers or directors; (6) absence of corporate records; (7) the use of the corporation as a facade for the operations of the dominant stockholder or stockholders; and (8) the use of the corporate entity in promoting injustice or fraud.

*Jones & Trevor Mktg., Inc. v. Lowry*, 2010 UT App 113, ¶ 7, 233 P.3d 538 (emphasis and internal quotation marks omitted).

 ¶ 39 There is no evidence in the record with respect to factors 1 through 6. With respect to the last two factors, Ottens contends that Dan used D & K to move his personal property, thereby promoting injustice. However, "[w]ithout any evidence of the other alter ego factors, we cannot gauge the materiality of the [two] factor[s] on which evidence was presented." *Id.* ¶ 10. Moreover, we see no injustice where Ottens was aware that the corporation had some involvement long before trial. D & K was listed in the accident report as the owner of the green truck, and Jake identified the company as his employer on the day of the accident during his deposition, taken less than five months after the complaint was served and years before trial.[19] Finally, there is nothing in the record to indicate that Ottens was prevented from investigating the role of D & K during discovery. Consequently, we agree with the trial court that Ottens did not properly assert or establish an alter ego theory.[20]

## II. Ottens's Motions to Add Parties

 ¶ 40 We next address Ottens's claim that it was error for the trial court to deny her motions to amend her complaint to add Jake and D & K as defendants. Rule 15(a) of the Utah Rules of Civil Procedure provides that parties have a right to amend their pleadings under certain limited circumstances not relevant here. *See* Utah R. Civ. P. 15(a). "Otherwise a party may amend his pleading only by leave of the court . . .; and leave shall be freely granted when justice so requires." *Id.* Justice does not require the court to grant a motion to amend if the amendment would be futile due to the legal insufficiency of the amended pleading. *See Jensen v. IHC Hosps., Inc.*, 2003 UT 51, ¶ 139, 82 P.3d 1076. A motion to amend may also be properly denied if it is untimely, even if the amended pleading raises valid claims within the applicable limitations period. *See Daniels v. Gamma W. Brachytherapy, LLC*, 2009 UT 66, ¶¶ 57–60, 221 P.3d 256. Here, the first trial judge denied Ottens's motion to add Jake as a defendant for two reasons: (1) because any amendment would be futile due to the expiration of the statute of limitations on the claims against Jake; and (2) because even if the statute were tolled, the motion was untimely due to Ottens's failure to file it for almost six months after she received Dan's answer.[21] With respect to Ottens's

**19.** Dan points us to other deposition testimony as further support for his contention that Ottens was aware from an early stage in the litigation that the defense claimed that D & K moved the property. However, those portions are not part of the record on appeal, and we do not consider them.

**20.** Ottens also contends that Dan improperly failed to plead a corporate shield defense-a defense Dan indicated to the trial court that he was not raising. In her opening brief, Ottens does not cite to rule 8(c) of the Utah Rules of Civil Procedure, which identifies affirmative defenses that must be set forth in the answer to a complaint, *see* Utah R. Civ. P. 8(c), but instead cites to rule 9(*l*), which requires a party to set forth a defense based on allocation of fault "to a non-party" who may be partly liable under Utah's comparative negligence statute, *see id.* R. 9(*l*); Utah Code Ann. §§ 78B–5–817 to –821 (2008). However, rule 9(*l*) is not applicable because

Dan's testimony that D & K, not Dan, hired Jake was not introduced to allocate some of Dan's liability to D & K under Utah's comparative negligence statute, but rather to show that Dan was not personally liable in the first instance. To the extent that Ottens raises any other issues regarding a corporate shield defense, we conclude that those issues are inadequately briefed and decline to address them. *See generally* Utah R.App. P. 24(a)(9) (discussing briefing requirements); *Daniels v. Gamma W. Brachytherapy, LLC*, 2009 UT 66, ¶ 52, 221 P.3d 256 (stating that "we will not assume a party's burden of argument and research," and declining to address an issue where the party's "brief has not provided any serious analysis of the issue" (internal quotation marks omitted)).

**21.** Because we conclude that Ottens's amended complaint would have been futile due to her failure to file it within the applicable limitations

motion to add D & K as a defendant, which motion was made for the first time during trial, the second trial judge held that it was untimely and would subject D & K to undue prejudice, *see generally id.* ¶ 58 ("Trial courts should liberally allow amendments unless the amendments include untimely, unjustified, and prejudicial factors.").

¶ 41 On appeal, Ottens argues that her motion to add Jake was not futile because the statute of limitations does not apply for two reasons: (1) the amendment related back to the original complaint, *see* Utah R. Civ. P. 15(c), and (2) the discovery rule tolled the statute of limitations, *see Berneau v. Martino*, 2009 UT 87, ¶ 22, 223 P.3d 1128. With respect to her attempt to add D & K, Ottens limits her argument on appeal to the contention that the claims against it relate back to the original complaint. We address each argument in turn.

A. **Claims Against Jake and D & K Do Not Relate Back to the Original Complaint.**

¶ 42 Rule 15 anticipates the possibility that a party may seek to amend the pleadings after the expiration of the relevant statute of limitations. Where the new "claim or defense" arises out of the same "conduct, transaction, or occurrence ... as set forth in the original pleading," the postexpiration amendment may be deemed to have been filed at the same time as the original pleading—to relate back. *See* Utah R. Civ. P. 15(c). However, rule 15 does not include any reference to the addition of new parties, *see id.* R. 15. In *Doxey–Layton Co. v. Clark*, 548 P.2d 902 (Utah 1976), our supreme court noted that omission and explained that the rule is typically limited to new claims because, if it also applied generally to parties, "the purpose of a statute of limitation would be defeated." *See id.* at 906.

¶ 43 Nevertheless, there are limited circumstances when a claim against a new party may relate back to the original complaint. "Utah courts have allowed the rela-

tion back of amendments to complaints incorporating newly named parties in two types of cases: (1) in so called 'misnomer cases,' and (2) where there is a true 'identity of interest.'" *Penrose v. Ross*, 2003 UT App 157, ¶ 11, 71 P.3d 631. Because the original complaint against Dan did not "contain[ ] a technical defect in the naming or identification of [Dan]," *see id.* ¶ 12, we focus our analysis on whether there was an identity of interest between Dan and Jake.[22] To prevail on her relation back argument based on an identity of interest, Ottens had to establish that

> (1) the amended pleading alleged only claims that arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading and (2) the added party had received (actual or constructive) notice that it would have been a proper party to the original pleading such that no prejudice would result from preventing the new party from using a statute of limitations defense that otherwise would have been available.

*Gary Porter Constr. v. Fox Constr., Inc.*, 2004 UT App 354, ¶ 40, 101 P.3d 371; *see also Doxey–Layton*, 548 P.2d at 906 (discussing the requirements for an amendment to relate back to the original pleading); *Penrose*, 2003 UT App 157, ¶ 9, 71 P.3d 631 (discussing amendments that add parties).

¶ 44 There is no dispute that the claims against Jake and D & K arose out of the same conduct and occurrence as set forth in the original complaint against Dan. Under those circumstances, "the only issue" is whether Jake and D & K "had sufficient actual or constructive notice that [they] would have been a proper party to the original pleading before the [statute of limitations] expired." *Gary Porter Constr.*, 2004 UT App 354, ¶ 42, 101 P.3d 371. Thus, to prevail on her argument that the claims against Jake and D & K relate back to the complaint against Dan, Ottens had to establish that Jake and D & K had actual or constructive notice of those claims before

---

period, we do not address this second basis for the trial court's decision.

**22.** Despite Ottens's attempt to characterize her confusion about who drove the green truck as a misnomer, there was no technical error that re-

sulted in Dan being served with the complaint. Rather, Ottens intended to name Dan and did so. Consequently, we do not consider Ottens's misnomer argument further.

March 29, 2006. *See generally Perry v. Pioneer Wholesale Supply Co.*, 681 P.2d 214, 216–17 (Utah 1984) (holding that claim was barred in the absence of evidence showing an identity of interest between the new party and any of the original parties).

¶ 45 One of the ways to establish notice is by proving that the original and new party share "the same interest" concerning the litigation, including their legal defenses and positions, *see Penrose*, 2003 UT App 157, ¶¶ 15–19, 71 P.3d 631, such that "notice of the action against one serves to provide notice of the action to the other,"[23] *Perry*, 681 P.2d at 217; *accord Gary Porter Constr.*, 2004 UT App 354, ¶ 35, 101 P.3d 371. We have previously referred to this method of proving constructive notice as the "Notice Transfer Test," and we use that nomenclature here, *see Gary Porter Constr.*, 2004 UT App 354, ¶ 35, 101 P.3d 371. Ottens argues that she has met that burden under the Notice Transfer Test. The trial court concluded that Dan and Jake did not share an identity of interest because they did not have the same legal positions in the litigation and, thus, held that Ottens's proposed amendment would be futile. We agree that Ottens has not satisfied the Notice Transfer Test. With respect to her claim against Jake for improperly securing the load, however, our reasons for reaching that conclusion differ from those of the trial court.

1. Dan and Jake Share the Same Legal Position Only with Respect to the Claim that They Negligently Secured the Load.

¶ 46 Dan relies on our decision in *Penrose* to support his argument that he and Jake do not have the same legal position in the litigation. There, the plaintiff was injured when a car pulled out of a parking lot and collided with her vehicle. *See Penrose*, 2003 UT App 157, ¶ 2, 71 P.3d 631. The

plaintiff filed a complaint for negligence against the alleged driver, the father, only days before the expiration of the statute of limitations on her claim. *See id.* After the limitations period had expired, the plaintiff filed an amended complaint, correctly naming the original defendant's son as the driver. *See id.* ¶ 3. The father filed a motion for summary judgment, claiming that he was not the driver, and the son filed a motion for summary judgment, asserting that the claim against him was barred by the statute of limitations. *See id.* ¶ 5. The trial court granted both motions, concluding that the claim against the son did not relate back to the original complaint due to the absence of an identity of interest between father and son concerning the litigation. *See id.* ¶ 6. This court affirmed the trial court's conclusion that the legal interests of the father and son were not identical, reasoning that,

> had [the plaintiff's o]riginal [c]omplaint properly named the parties, a disposition of the case against [the f]ather would not affect a determination as to [the son] because the two parties do not have the *same* legal interest in the outcome of the case. [The f]ather's defense is that he was not negligent or liable because he was not the driver. On the other hand, [the son's] affirmative defense focuses on the running of the statute of limitations. Even if the claim had been properly filed, [the son's] defense would be that he did not act negligently. A disposition as to either party does not affect the claims or defenses available to the other party. Thus, where they do not have the 'same' legal interest there is no identity of interest.

*Id.* ¶ 19.

¶ 47 Similarly, to the extent Ottens's claims are based on any theory dependent upon negligent operation of the green truck,[24] Jake and Dan do not share the

---

**23.** The absence of identical interests will defeat the relation back of claims against a new defendant, even when it is reasonable to assume that notice to the original defendant served as notice to the new party. *Compare Sulzen v. Williams*, 1999 UT App 76, ¶ 15, 977 P.2d 497 (concluding that relation back was appropriate where notice to parents could be reasonably assumed to serve as notice to their minor child, who lived with them), *with Penrose v. Ross*, 2003 UT App 157,

¶¶ 10, 19–20, 71 P.3d 631 (concluding that despite shared residence, father and son had distinct legal interests preventing relation back).

**24.** Ottens testified that the loaded pickup truck "just started pulling over, no signal, no nothing. And he pulled over and he was too close to me when he pulled over." "And he hadn't been there but just a second or two and this chair blew out of the back at windshield height."

same legal position. While Dan argues that he is not liable because he was not the driver, Jake would argue that the statute of limitations has expired and that he was not negligent in the operation of the vehicle. Therefore, the trial court correctly rejected Ottens's relation back theory based on the Notice Transfer Rule, as to the negligent driving claim. *Cf. Russell v. Standard Corp.*, 898 P.2d 263, 265 (Utah 1995) (rejecting claim of identity of interest in libel action based solely on use of similar material in newspaper articles pursuant to agreement); *Perry*, 681 P.2d at 217 (rejecting claim of identity of interest based solely on the privity of contract between new and original parties).

¶ 48 With respect to Ottens's claim that both Jake and Dan failed to secure the load properly, however, their legal positions are identical. The evidence at trial established that they undertook the task of securing the load in the green truck together, passing rope through the various items and then fastening the rope to the eye hooks in the trucks. Because we have already concluded that the active participation in securing a load imposes a duty not to do so negligently, this aspect of Ottens's negligence claim is not dependent on also establishing the identity of the driver. Furthermore, the determination of liability as to either Dan or Jake would "depend[ ] on or affect[ ] the determination of the issues as to the other," *see Penrose v. Ross*, 2003 UT App 157, ¶ 16, 71 P.3d 631 (internal quotation marks omitted), because a finding as to whether it was negligently secured and caused Ottens's injuries in an action against one of them necessarily affects the liability of the other.

## 2. Ottens Did Not Establish that Notice to Dan Served as Notice to Jake.

¶ 49 Notwithstanding our determination that the legal positions of Jake and Dan are the same with respect to the claim that they negligently secured the load, we conclude that it is not "reasonable to assume that notice of the substance of the claims against [Dan] served as notice to [Jake]." *See Gary Porter Constr. v. Fox Constr., Inc.*, 2004 UT App 354, ¶ 36, 101 P.3d 371. Unlike our decision in *Sulzen v. Williams*, 1999 UT App 76, 977 P.2d 497, where we held that it was "entirely reasonable to assume that" notice to the parents served as notice to their minor child residing in the home where service was affected, *see id.* ¶ 15, Dan and Jake do not live together and the record is silent concerning the frequency of their communications.[25] Furthermore, we reject an invitation to adopt a per se rule that notice to a parent is always notice to the parent's child, irrespective of the child's age or location. *Cf. Gary Porter Constr.*, 2004 UT App 354, ¶ 43, 101 P.3d 371 (refusing to adopt a per se rule that notice to a general contractor constitutes notice to its surety). This is particularly appropriate in cases such as this, where the record contains no evidence concerning Dan's and Jake's earliest discussions about the litigation, the circumstances and timing of the representation of Jake by Dan's lawyer,[26] or any other facts showing that Dan's and Jake's interests were so intertwined that notice to Dan effectively notified Jake.

¶ 50 Because we hold that, under the Notice Transfer Test, Jake did not have constructive notice within the limitations period,

---

25. At the time Ottens served the original complaint on March 13, 2006, Dan lived in a remote area of Oregon, while Jake resided in Utah. Dan was then approximately fifty years old and Jake was approximately twenty-six years old.

26. Knowledge may be imputed where the new party shared counsel with the original party "prior to the running of the statute of limitations." *Gary Porter Constr. v. Fox Constr., Inc.*, 2004 UT App 354, ¶ 44, 101 P.3d 371 (remanding for further proceedings where the record did not indicate whether new and original parties "shared counsel prior to the lapse of the [statute of limitations]"). Here, Jake was represented at

his deposition, taken after the limitations period had expired, by the same counsel as Dan. The record does not contain any information as to when counsel first met with or represented Jake. Furthermore, this issue was addressed only in passing by Ottens in the context of her claims against D & K where she speculates that D & K would most likely hire the same counsel as Dan, and is inadequately briefed, *see generally* Utah R.App. P. 24(a)(9) (outlining briefing requirements); *State v. Lucero*, 2002 UT App 135, ¶¶ 8–9, 47 P.3d 107 (holding that an appellate court need not consider issues that are inadequately briefed).

we consider whether Jake's actual knowledge can be shown from other circumstances. *See generally id.* ¶ 42 ("[T]he Notice Transfer Test . . . is merely one way of demonstrating that an added party had sufficient notice to avoid prejudice."). We conclude that Ottens did not present any evidence that could support a finding that Jake had actual knowledge of the claims asserted against Dan before the statute of limitations expired.

¶ 51 Jake learned of the proceedings, at the latest, on July 10, 2006, when he was served with a subpoena duces tecum scheduling his deposition for August 10, 2006. However, the subpoena was served after the statute of limitations ran, and there is no evidence concerning the level, if any, of Jake's knowledge or his unofficial involvement in the proceedings before he received the deposition subpoena. *See generally Nunez v. Albo,* 2002 UT App 247, ¶ 30, 53 P.3d 2 (holding that the medical malpractice claim against a university related back to the original complaint against the treating physician where the university provided counsel to the physician and directed the defense from the start). And there is no other evidence in the record concerning Jake's first knowledge of or participation in the lawsuit.

¶ 52 Despite two opportunities, the first of which was presented at a hearing on the motion to amend, made approximately five months after she received Dan's answer, and the second of which occurred after approximately three days of trial, Ottens failed to produce the evidence necessary to support a finding that Jake had constructive or actual notice that he was a proper party to the complaint before the limitations period expired. Under these circumstances, we affirm the first trial judge's conclusion that the claims against Jake, including the allegations based on negligently securing the load, do not relate back to the original complaint and were barred by the statute of limitations. *Cf. Penrose,* 2003 UT App 157, ¶¶ 6, 21, 71 P.3d 631 (affirming the trial court's entry of summary judgment based on the statute of limitations where there was no dispute that the parties' interests concerning the litigation were not identical). *But see Gary Porter Constr.,* 2004 UT App 354, ¶ 46, 101 P.3d 371 (remanding for further proceedings to determine whether the new party had actual or constructive notice where there were disputed issues of fact and the case was resolved by summary judgment).

3. **D & K and Dan Do Not Share an Identity of Interest.**

¶ 53 We next address Ottens's assertion that the second trial judge erred by denying her late-trial motion to amend the complaint to add D & K as a party. According to Ottens, such an amendment would relate back to her original complaint because Dan and D & K shared an identity of interest. Again, we are not convinced.

¶ 54 As discussed, relation back in the context of adding parties after the statute of limitations has expired is dependent both on whether notice to one also notified the other and whether the legal positions of the original and proposed party are the same. *See Penrose,* 2003 UT App 157, ¶¶ 15–17, 71 P.3d 631 (affirming summary judgment based on statute of limitations where, despite notice, the new party's interests concerning the litigation were not the same as the original party's interests). The defenses asserted by Dan and those likely to be advanced by D & K are not identical; to some extent, they are directly contrary.

¶ 55 While both Dan and D & K would assert that the chair was not negligently secured, they would be in direct disagreement as to which of them bears the risk of a contrary determination. Dan's defense is that he and Jake were working for the company on the day of the move and that any liability for negligence falls squarely on D & K. As we have already held, Ottens has not proved that D & K is the alter ego of Dan. Therefore, there is no reason to conclude that D & K, which was owned equally by Dan and his former wife, would not offer its own defense. Because D & K was not named as a defendant, we can only speculate what those defenses would have been. It is apparent, however, that D & K can best defend against liability for negligence by distancing itself from the actions of Dan and Jake. Logically, D & K would argue that Dan was not acting within the course and scope of his employment, that Dan had hired Jake personally to assist with his move to a new residence, and that Dan is personally liable for any damage to Ottens. Had it been a

party to the action, D & K may have provided the evidence necessary to establish these defenses. While a determination of whether Dan was acting in his individual capacity would affect the claim against D & K, *see generally id.* ¶ 16, each party would be arguing for a different conclusion on that point. Therefore, we hold that there is not an identity of interest between the company and Dan. As a result, the amendment to add D & K would not relate back to the original complaint and, thus, would be barred by the statute of limitations.

■ ¶ 56 This conclusion is consistent with the underlying premise that a party should be added after the running of the limitations period only when there will be no prejudice. *See Doxey–Layton Co. v. Clark,* 548 P.2d 902, 906 (Utah 1976) (explaining that where the "new and old parties have an identity of interest . . . it can be assumed or proved the relation back is not prejudicial"). Here, even though notice to Dan, a corporate officer, might be considered notice to the company, the conflict in their legal interests would be prejudicial to D & K, which is equally owned by Dan's former wife. If D & K had been added as a defendant near the close of evidence, it would have suffered from Dan's pursuit of his personal interests in the litigation, notwithstanding the contrary interests of D & K. The requirement that the new and old parties' positions in the litigation be the same assures that such prejudice to the company and its other owner does not occur. For these reasons, we also agree with the trial court that Ottens's motion was untimely and prejudicial.[27]

B. The Statute of Limitations on Ottens's Claims Against Jake Should Not Be Tolled Under the Equitable Discovery Rule.

■ ¶ 57 As an alternate basis for her position that the amendment to add Jake as a defendant would not be futile, Ottens argues that the statute of limitations should

have been tolled under the equitable discovery rule. If she is correct, an order granting Ottens leave to amend the complaint to add all of her claims against Jake would not have been futile. While a statute of limitations "ordinarily begins to run upon the completion of a cause of action, the equitable discovery rule may nonetheless operate to toll the limitations period until the time at which a party discovered or reasonably should have discovered [the] facts forming the basis for the cause of action." *Berneau v. Martino,* 2009 UT 87, ¶ 22, 223 P.3d 1128 (internal quotation marks omitted). Our supreme court has identified two situations that can support the application of the equitable discovery rule: first, where "a plaintiff does not become aware of the cause of action because of the defendant's concealment or misleading conduct," and second, where "the case presents exceptional circumstances and the application of the general rule would be irrational or unjust, regardless of any showing that the defendant has prevented the discovery of the cause of action." *Id.* ¶ 23 (internal quotation marks omitted). Before either of these doctrines can be applied, the party seeking relief from the statute of limitations must make an initial showing that the party "did not know and could not reasonably have discovered the facts underlying the cause of action in time to commence an action within [the limitations period]." *Colosimo v. Roman Catholic Bishop of Salt Lake,* 2007 UT 25, ¶ 19, 156 P.3d 806 (alteration in original) (internal quotation marks omitted); *accord Macris v. Sculptured Software, Inc.,* 2001 UT 43, ¶ 18, 24 P.3d 984. The determination of whether the party has made that initial showing is a question of fact. *See Berneau,* 2009 UT 87, ¶ 23, 223 P.3d 1128.

1. We Assume that Ottens Satisfied the Initial Showing Required to Invoke the Equitable Discovery Rule.

¶ 58 Here, the parties disagree about whether Ottens has made that initial show-

---

27. We need not address Dan's argument that adding D & K during the closing stages of the trial would violate the Due Process clauses of the United States and Utah Constitutions, *see* U.S. Const. amend. XIV; Utah Const. art. I, § 7, because of our conclusion that the legal interests of D & K and Dan are not identical and that the motion was otherwise untimely. *See generally* *Bailey v. Bayles,* 2002 UT 58, ¶ 13, 52 P.3d 1158 (holding that an appellate court may affirm "on any legal ground . . . apparent on the record" (emphasis and internal quotation marks omitted)); *State v. Thurman,* 846 P.2d 1256, 1262 (Utah 1993) (holding that courts avoid reaching constitutional questions unless it is necessary to do so).

ing. Ottens contends that because the accident report and the citation both identified Dan as the driver, she had no reason to question that information until she received Dan's answer only two days before her claims against Jake were barred by the statute of limitations. She further argues that to do otherwise would have been improper because the information was unreliable and imprecise. *See generally Robinson v. Morrow,* 2004 UT App 285, ¶ 24, 99 P.3d 341 (holding that the limitations period is tolled under the fraudulent concealment branch of equitable discovery until "the plaintiff receives reliable and precise information sufficient to give reasonable assurance that the defendant is in fact the tortfeasor"). Indeed, we have admonished that "[r]ule 11 requires the plaintiff's attorney to certify that 'the allegations and other factual contentions have evidentiary support or . . . are likely to have [it] after a reasonable opportunity for further investigation or discovery,' " *id.* ¶ 24 n. 3 (quoting Utah R. Civ. P. 11(b)(3)), and that "a plaintiff may be sanctioned for bringing a claim merely founded on innuendo and suspicion," *id.* (internal quotation marks omitted).

¶ 59 Dan has not offered any evidence that Ottens knew or should have known sooner that the report and citation were erroneous. Instead, Dan notes that Ottens served the original complaint only weeks before the end of the limitations period, *but cf. Berneau,* 2009 UT 87, ¶¶ 6, 32, 223 P.3d 1128 (holding that exceptional circumstances tolled the limitations period for appointment of a personal representative even though the plaintiff filed the original complaint "near the end of the . . . statute of limitations period"), and that the motion for leave to add Jake was not made until almost six months after Dan identified Jake in his answer. However, if Ottens reasonably could not have known Jake was the driver before she received the answer, the threshold question is whether she

could still have filed her claims against Jake within the two days remaining in the limitations period, *see id.* ¶ 23; *Russell Packard Dev., Inc. v. Carson,* 2005 UT 14, ¶¶ 30, 32, 108 P.3d 741.[28] The resolution of this issue is a question of fact. *See Berneau,* 2009 UT 87, ¶ 23, 223 P.3d 1128. For purposes of our analysis, we assume that the fact finder would have resolved in Ottens's favor the question of whether a reasonable plaintiff would have sued Jake during the limitations period remaining after Ottens reasonably should have known of Jake's involvement. Thus, we assume, without deciding, that Ottens has made the initial showing required under either prong of the discovery rule.[29]

### 2. Ottens Has Not Established that the Limitations Period Should Be Tolled.

¶ 60 We now turn to whether Ottens has shown grounds for tolling the limitations period. Ottens focuses much of her brief on Dan's actions, which she contends prevented her from filing her complaint sooner and concealed Jake's participation. However, she seeks tolling of the statute of limitations only under the exceptional circumstances branch of the equitable discovery rule. Indeed, when quoting from the supreme court's decision in *Russell Packard,* Ottens substitutes the supreme court's description of the fraudulent concealment basis for application of the rule with "[inapplicable to this case]." *See Russell Packard,* 2005 UT 14, ¶ 25, 108 P.3d 741. And in her reply to Dan's argument that his acts cannot be imputed to Jake, Ottens states that she "is not constrained to prove Jake committed malfeasance" but "must only show she reasonably delayed in filing her complaint due to 'exceptional circumstances.' " Consequently, we limit our analysis to the exceptional circumstances prong of the equitable discovery rule.

---

**28.** While *Russell Packard Development, Inc. v. Carson,* 2005 UT 14, ¶ 25, 108 P.3d 741, considered only the fraudulent concealment basis for application of the equitable discovery rule, we see no reason its analysis would not equally apply to the initial showing required in the context of an assertion of exceptional circumstances.

**29.** We acknowledge, however, that if Ottens's exceptional circumstances argument did not fail on other grounds, we would be compelled to remand this issue to the trial court for further proceedings. *See generally Russell Packard,* 2005 UT 14, ¶¶ 45–46, 108 P.3d 741 (remanding for further proceedings to resolve contested issues of material fact concerning when claims against new party should have been discovered).

¶ 61 The exceptional circumstances branch of the equitable discovery rule was adopted by the Utah Supreme Court in *Myers v. McDonald,* 635 P.2d 84, 87 (Utah 1981). Subsequent cases interpreting the exceptional circumstances branch of the equitable discovery rule have clarified that tolling is appropriate only "in situations where the case presents exceptional circumstances and the application of the general rule would be irrational or unjust." *Burkholz v. Joyce,* 972 P.2d 1235, 1235 (Utah 1998) (internal quotation marks omitted); *see also Breiggar Props., LC v. H.E. Davis & Sons, Inc.,* 2002 UT 53, ¶ 7 n. 2, 52 P.3d 1133 (refusing to broaden the definition of exceptional circumstances to include circumstances where the application of the statute of limitations would not be irrational or unjust); *Macris,* 2001 UT 43, ¶ 28, 24 P.3d 984 (refusing to toll statute of limitations where, even assuming party could make initial showing, there was nothing irrational or unjust about application of the limitation period); *Cedar Prof'l Plaza, LC v. Cedar City Corp.,* 2006 UT App 36, ¶ 13, 131 P.3d 275 (refusing to toll limitations period where there is nothing exceptional about the facts of the case). Ottens cannot meet either of these requirements.

¶ 62 The Utah Supreme Court's most recent discussion of the kinds of exceptional circumstances that warrant tolling of the limitations period is found in *Berneau v. Martino,* 2009 UT 87, 223 P.3d 1128. There, the supreme court reiterated that " 'the discovery rule balances the equitable interests of the potential plaintiff and defendant where the potential plaintiff has discovered [new] facts forming the basis for the cause of action.' " *Id.* ¶ 22 (alteration in original) (quoting *Beaver Cnty. v. Property Tax Div. of the Utah State Tax Comm'n,* 2006 UT 6, ¶ 53, 128 P.3d 1187). "The ultimate determination of whether a case presents exceptional circumstances is a question of law and turns on a balancing test," *id.* ¶ 23 (internal quotation marks omitted), that "examines '[t]he hardship the statute of limitations would impose on the plaintiff ... [as compared with] any prejudice to the defendant from difficulties of proof caused by the passage of time,' " *id.* (first alteration in original) (quoting *Myers,* 635 P.2d at 87).

¶ 63 The supreme court has identified several factors which may be relevant to the application of the balancing test, including

> whether the defendant's problems caused by the passage of time are greater than the plaintiff's, whether the defendant performed a technical service that the plaintiff cannot reasonably have been expected to evaluate, and whether the claim has aged to the point that witnesses cannot be located, evidence cannot be found, and the parties cannot remember basic events.

*Sevy v. Security Title Co. of S. Utah,* 902 P.2d 629, 636 (Utah 1995). Here, Jake's problems caused by the passage of time are greater than Ottens's. Ottens has been pursuing remedies against various parties for the injuries she claims were caused, at least in part, by Dan's and Jake's negligence since shortly after the March 29, 2002 accident. During that time, she has had the opportunity to investigate the circumstances of the accident and to preserve the evidence supporting her claims, including the ability to locate witnesses and memorialize their perceptions of the event. In contrast, Jake was completely unaware that any legal action had or would be initiated until years later. While Ottens chose not to investigate her claims thoroughly until the eleventh hour, Jake was given no choice in the matter. Jake did not know he had any reason to preserve the evidence because there is nothing in the record to establish that he was aware of Ottens's allegations. In addition, there is nothing technical about securing this type of load or driving the green truck that would have prevented Ottens from bringing her action sooner. And by the time Ottens took their depositions, the claims had aged to the point that Dan and Jake had difficulty remembering many of the basic facts, including who assisted with the move, whether Jake returned to work at D & K that day, and whether Dan spoke with the police immediately after the accident. Likewise, there was obvious difficulty locating witnesses, and the chair itself could not be found.

¶ 64 We are also convinced that there is nothing unique or exceptional about this case that might tip the balance in favor

of Ottens. The exceptional circumstances branch of the equitable discovery rule provides a narrow exception to the court's enforcement of the plain language of legislative enactments, *see Myers*, 635 P.2d at 86–87. By tolling the statutory limitations period pursuant to this doctrine, a court necessarily rejects the balance struck by the legislature between allowing the pursuit of legal remedies and protecting against the difficulties of defending a stale claim. As the name indicates, the case must present exceptional circumstances to warrant application of the doctrine; cases presenting ordinary situations in which the party seeking relief did not discover the claim before the deadline set by the legislature had expired are not included, *see Breiggar Props.*, 2002 UT 53, ¶ 7 n. 2, 52 P.3d 1133 (holding that plaintiff's confusion as to the applicable statute of limitations for trespass and continuing trespass did not present exceptional circumstances); *Cedar Prof'l Plaza*, 2006 UT App 36, ¶ 13, 131 P.3d 275 (noting that the submission of an otherwise compliant notice to the wrong governmental agent did not present exceptional circumstances).

¶ 65 For example, *Myers* involved guardians who, despite diligent efforts to locate their ward after he was assumed to have run away from home, first learned of his death after the limitations period had expired. *See* 635 P.2d at 85. Nevertheless, the guardians filed a complaint against the alcohol-impaired driver alleged to have killed their ward, and the driver moved for summary judgment based on the statute of limitations. *See id.* In adopting and applying the exceptional circumstances branch of the discovery rule, the *Myers* court stressed the unique circumstances of the case, the guardian's diligent efforts to find their ward, and the inability of the guardians to investigate the circumstances of their wrongful death claim when they did not know their ward was dead until after the end of the limitations period, *see id.* at 86–87.

¶ 66 The circumstances were equally compelling in *Berneau*. In that case, the plaintiff was injured in a car accident and sued the driver of the vehicle "near the end of the four-year statute of limitations." *Berneau*, 2009 UT 87, ¶ 6, 223 P.3d 1128. Over the next three years, counsel for the plaintiff "engaged in ongoing written and verbal communications" with counsel for the insurer of the driver. *Id.* ¶ 5. What neither lawyer knew was that the twenty-two year old driver had died shortly after the accident from unrelated causes. *See id.* ¶ 4. Upon first learning of the driver's death after the limitations period ran, the plaintiff filed an amended complaint naming the driver's estate. *See id.* ¶¶ 6–7. The trial court granted the insurer's motion to dismiss the amended complaint due to the plaintiff's failure to appoint a personal representative within three years of the driver's death as required by statute. *See id.* ¶¶ 7–8. The Utah Supreme Court reversed, concluding that the case presented exceptional circumstances for a number of reasons, including that the legislative intent evidenced by the limitations period for the appointment of a personal representative conflicted with the legislative intent expressed by the four-year statute of limitations in which the underlying claim could be brought. *See id.* ¶ 21. Concluding that the situation presented was indeed extraordinary, the *Berneau* court tolled the limitations period for appointment of a personal representative for the estate. *See id.* ¶ 32.

¶ 67 We see nothing exceptional about a plaintiff waiting until the end of the limitations period and then learning that the underlying assumptions of her claim were erroneous. Rather, that is the risk to all parties who delay litigation of a claim with a statutorily mandated time limit. *See Estes v. Tibbs*, 1999 UT 52, ¶ 7, 979 P.2d 823 ("Many claimants lose the opportunity to pursue a cause of action when a statute of limitations is applied to their individual cases."). Indeed, the Utah Supreme Court has cautioned,

> "The doctrine of equitable tolling should not be used simply to rescue litigants who have inexcusably and unreasonably slept on their rights, but rather to prevent the expiration of claims to litigants who, through no fault of their own, have been unable to assert their rights within the limitations period."

*Beaver Cnty. v. Property Tax Div. of the Utah State Tax Comm'n*, 2006 UT 6, ¶ 32,

128 P.3d 1187; *see also Estes*, 1999 UT 52, ¶ 9, 979 P.2d 823 ("[A]pplication of the 'special circumstances exception' must be reserved for instances where it would be truly 'irrational' or 'unjust' to apply a statute of limitations."). Ottens was not unable to assert her claims sooner; there was nothing that prevented her from serving the complaint on Dan earlier, taking discovery, and naming Jake within the limitations period. Instead, Ottens waited until less than twenty days before the four-year limitations period expired before serving the complaint on Dan. We conclude that the facts of this case do not support application of the exceptional circumstances branch of the equitable tolling doctrine. Because her relation back claim also fails, the trial court was correct that the proposed amendment to add Jake would have been futile.

### III. The Evidentiary Rulings

¶ 68 Finally, we address Ottens's assertion that the trial court erred in excluding the traffic citation and admitting evidence regarding when Ottens retained legal counsel.[30] We agree with the trial court that the citation was not relevant to the issues before the jury. With respect to the date when Ottens retained counsel, however, we disagree with the trial court's assessment that it is relevant.

### A. The Traffic Citation Is Not Relevant.

■ ¶ 69 We turn first to Ottens's claim that the traffic citation should have been admitted because it was relevant to the issue of who was driving the vehicle. While the parties focus their arguments on rule 416 of the Utah Rules of Evidence, which provides that "[e]vidence that a person was convicted under a provision of Utah Code Annotated Title 41, Chapter 6a,[31] of an infraction or class C misdemeanor is not admissible on the issue of whether the person acted negligently or otherwise wrongly, or to impeach the person's testimony on those issues," Utah R.

Evid. 416, the issue is more easily resolved under rule 402, which excludes irrelevant evidence, *see id.* R. 402. Dan argues that the trial court properly excluded the citation as irrelevant because Dan and Jake both conceded that Jake, rather than Dan, was driving the car, and therefore, "the question of who was driving was not at issue." We agree.

¶ 70 Ottens's amended complaint alleges that Jake drove the truck from which the chair fell. Dan conceded this point, and Jake confirmed it in his deposition. Although Ottens had originally sued Dan as the driver, she had abandoned that claim before trial. Consequently, the fact that the citation erroneously identified Dan as the driver was irrelevant to the issues that had been joined at trial. *See generally id.* R. 401 (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact *that is of consequence to the determination of the action* more probable or less probable than it would be without the evidence." (emphasis added)); *id.* R. 402 ("Evidence which is not relevant is not admissible."). Under these circumstances, we cannot say that the trial court exceeded its discretion in excluding the citation.

### B. When Ottens Hired an Attorney Is Not Relevant.

■ ¶ 71 Finally, we address Ottens's argument that the trial court erred when it permitted Dan to introduce evidence concerning when Ottens retained counsel. According to Ottens, that evidence was both irrelevant and improper because Dan used it to suggest that Ottens "retained an attorney not to protect her legal rights, but to plot with her attorney regarding how to run the [medical] bill up and dishonestly fabricate a case against Dan." In response, Dan argues that, under *Pennington v. Allstate Insurance Co.*, 973 P.2d 932 (Utah 1998), evidence regarding when a party retained counsel is

---

30. We decide these issues because they are "likely to reoccur on remand" of the claim against Dan for negligently securing the load. *See Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 53, 176 P.3d 476.

31. A copy of the traffic citation was not included in the record, so we cannot determine the title and chapter of the Utah Code under which it was issued. Indeed, we express no opinion as to whether rule 416 of the Utah Rules of Evidence has any application to this case.

relevant because "early attorney involvement may imply, under the right circumstances, that the treatment was not reasonable." However, the issue addressed in *Pennington* arose in a different context. There, the supreme court considered the attorney's involvement on behalf of a plaintiff in a personal injury action as part of its determination of whether the attorney's attempt to recover unreasonable medical expenses justified sanctions under rule 11 of the Utah Rules of Civil Procedure, *see id.* at 938–39; *see also* Utah R. Civ. P. 11.

¶ 72 From the record before us on appeal, it does not appear that Dan contends that Ottens's attorney unethically inflated her medical expenses. Therefore, we agree with Ottens that, based on Dan's assertions, the time when she hired counsel was not relevant.

## CONCLUSION

¶ 73 Because competent evidence could support a finding that Dan was directly liable for negligently securing the fully loaded trucks, we reverse the trial court's entry of a directed verdict in favor of Dan on that claim. However, we affirm the trial court's directed verdict in favor of Dan on Ottens's vicarious liability claim based on her assertion that Dan personally employed Jake on the day of the move.

¶ 74 We hold that neither the claims against D & K nor those against Jake relate back to the original complaint. We also conclude that, even if all factual issues are resolved in favor of Ottens, this case does not present exceptional circumstances that could toll the statute of limitations under the equitable discovery rule.

¶ 75 Finally, the trial court did not exceed its discretion in excluding the traffic citation, but it should have also excluded the evidence as to when Ottens first retained counsel.

¶ 76 Consequently, we remand for trial on the theory that Dan negligently secured the fully loaded trucks but affirm the dismissal of the other claims against Dan and the denial of Ottens's motions to add D & K and Jake as parties after the limitations period had expired.

¶ 77 Affirmed, in part; reversed and remanded, in part.

¶ 78 WE CONCUR: JAMES Z. DAVIS, Presiding Judge and J. FREDERIC VOROS JR., Judge.